P. W. CURREY and Mrs. James D. Currey d/b/a Currey & Currey a/k/a Currey, Shields & Currey, Appellants,

v.

CORPORATION COMMISSION OF OKLAHOMA, Dan R. Dunnett, Director of Conservation for Corporation Commission of Oklahoma, Appellees.

No. 51906.

Supreme Court of Oklahoma.

June 12, 1979.

As Corrected on Denial of Rehearing Sept. 22, 1980.

Manville T. Buford, Buck, Crabtree, Ransdell & Buford, Oklahoma City, for appellants.

Harvey H. Cody, Jr., Conservation Atty., Nathan S. Sherman, Asst. Conservation Atty., Oklahoma Corp. Com'n, Oklahoma City, for appellees.

WILLIAMS, Justice.

Appeal is taken by P. W. Currey and Mrs. James D. Currey d/b/a Currey & Currey a/k/a Currey, Shields & Currey (Appellant/Currey) from Order No. 137273 of the

Corporation Commission (Commission) directing Currey to replug two wells located in Stephens County.

Appellant obtained oil and gas exploration lease rights to restricted Choctaw lands located in Stephens County, Oklahoma. The lease was obtained through the Bureau of Indian Affairs (BIA), which then turned direct supervision to the United States Geological Survey (USGS).

Evidence adduced before the Trial Examiner for the Commission disclosed further that Currey drilled three wells, "Sophie Harrison No. 1," "Sophie Harrison No. B–1" and "Sophie Harrison No. B–2" (wells). All three wells were abandoned in the mid–1950's. The wells were thereafter plugged, and appropriate reports made to USGS. Parties disagree as to the degree of compliance with Commission filing requirements, but both agree that Currey did not fully comply with all Commission filing requirements.

In 1976 Continental Oil Company, an adjacent and contiguous lessee, discovered salt water purging from one of Currey's wells. Continental informed the Commission, which thereafter inspected the site, found one well to be purging and issued a complaint. The complaint was later amended to encompass another well found to be purging.

Extensive testimony was taken by the trial examiner regarding compliance with USGS plugging requirements and conformity to Commission filing requirements. The degree of compliance is not determinative.

It is not disputed that the wells were drilled and operated by Currey over twenty years ago, and that now two of these wells are spewing forth salt water in excess of forty barrels a day onto the land.

Appellant contends generally that the Corporation Commission has no jurisdiction to order reworking or replugging of wells because the wells are located on restricted Indian lands under exclusive jurisdiction of the Federal Government.

Appellant Currey further argues that even if the Federal Government lacks exclusive jurisdiction, still the Commission is without statutory authority to compel replugging. We shall deal with the second argument first.

Appellant relies heavily on *Minshall v. Corporation Commission,* Okl., 485 P.2d 1058 (1971), which has been further clarified by *Ashland Oil, Inc. v. Corporation Commission,* Okl., 595 P.2d 423. *Ashland, supra* clarifies *Minshall* and addresses itself more specifically to such facts as are involved in the case at bar as follows:

Ashland urges on appeal that *Minshall v. Corporation Commission,* Okl., 485 P.2d 1058 (1971) controls. In *Minshall,* the Corporation Commission found that a well drilled, plugged, and abandoned by Minshall was leaking gas through and onto the ground. Apparently relying upon 52 O.S.Supp.1965, § 310 [1], the Commission ordered Minshall to replug the well.

On appeal, the *Minshall* court stated in its syllabus: 'Neither 17 O.S.1961, § 53, nor any of the provisions of Senate Bill No. 396 of the Thirtieth (1963) Oklahoma Legislature (Chapter 191 O.S.L.1965; 52 O.S.Supps.1965–1969, §§ 309 through 317) imposes upon any one an obligation to replug, or repair, an abandoned well that has been plugged but is presently leaking salt water, oil, gas, or other deleterious substances.'

.  .  . At page 1061 of *Minshall,* we read: ' * * * If the well has been plugged, the question of whether or not it was properly plugged in accordance with the then–effective rules and regulations is not involved.'

Additionally, as the Commission correctly points out, the Court in *Minshall* clearly limited its consideration to the application of 52 O.S.Supps.1965–1969, §§ 309–315 on the question of an operator's responsibility and did not concern itself with amendments to that Act enacted subsequent to the order of the Commission or with any other existing statutes.

1. Amended by Laws 1970, c. 217, § 2.

For purposes of the instant action it is important to note that the Court did not consider the impact of the 1970 Amendment to § 310 (Laws 1970, ch. 217, § 2) which provides: ' * * * (b) that the operator or any other person responsible for plugging, replugging or repairing the well in such manner as is necessary to prevent further pollution cannot be found, or is financially unable to pay the cost of performing such work. * * * '

Without question, *this provision supplies the explicit legislative imposition of the operator's liability for 'plugging, replugging or repairing' which was found missing at the time Minshall was decided.* Consideration of this provision together with numerous other statutory declarations[2] leaves absolutely no room for doubt that the Corporation Commission has the statutory power to order an operator to replug wells which were improperly plugged. * * * (Emphasis added).

█ The record reveals the Commission's finding that the wells were not properly plugged was supported by substantial evidence. This Court is not required to weigh the evidence on appeal, but to review the evidence and affirm the order where the finding and conclusions of the Commission are sustained by law and substantial evidence. O.S.1971 Const. Art. 9 § 20; *Superior Oil Co. v. Oklahoma Corporation Commission*, 206 Okl. 213, 242 P.2d 454 (1952). Assuming Oklahoma has jurisdiction over wells drilled on restricted Indian land, the Commission has the authority to order reworking or replugging of these wells, and we so hold.

██ Next requiring attention is appellant's second major argument that because the wells were drilled on restricted Indian lands Oklahoma is without jurisdiction.

Currey cites as authority O.S.1971 Const. Art. 1 sec. 3 as follows:

The people inhabiting the State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States.

and Public Law No. 83–280, 67 Stat. 588 (1953), which in pertinent part states:

Sec. 6. Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, *where necessary,* their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of the Act: * * . (Emphasis added.)

Appellant simply argues that the Constitutional impediment under Sec. 3 *supra* has not been properly removed by any Constitutional amendment. Appellant proceeded on the assumption that if a right is held by the Federal Government and later abrogated, then there must be an affirmative corresponding state enactment to fill the void. This assumption is erroneous.

A federal district court held[3] in construing P.L. 280 *supra* that: "Congress, under the constitutional power to regulate commerce with the Indians, has preempted the field of regulation of Indian land *to the extent that such is necessary* to protect the Indians' rights therein and to preserve title thereto until the day when the Indian has developed culturally to a point where he can deal and manage his own affairs."

The Court goes on further to say that, "Congress in recent years has recognized that Indians in some states, . . . have reached a state of acculturation where some

---

2.  17 O.S.1971, §§ 51, 53; 52 O.S.1971, §§ 86.2, 86.3, 236 247, 271 -279, 309–320; 52 O.S.Supp. 1975, § 102.

3.  *Agua Caliente Band of Mission Indians' Tribal Council et al. v. City of Palm Springs, etc. et al.* (D.C.Cal.), 347 F.Supp. 42 (1972).

federal controls might properly be relaxed. * * * Public Law 280, like other similar laws in recent years, is a withdrawal by Congress from its preemption in this field. It has done so in this case by express grant to the state of authority, among other things, to exercise its police power in such a way as to impose upon Indian lands the same regulations imposed upon all lands within the boundaries of the state. *To the extent that any further withdrawal by the Federal Government occurs, the sovereignty of the state becomes enlarged to that extent.*" (Emphasis added).

In 1947, prior to the drilling and plugging of the wells in question, Public Law 80–336, found in 61 Stat. 731, Act of August 4, 1947 Ch. 458, was passed by the Congress of the United States. Section 11 of said Act specifically withdraws Congress from preemption in the field of oil and gas conservation and thereby enlarged the sovereignty of Oklahoma to that extent. It reads:

"11. All restricted lands of the Five Civilized Tribes are hereby made subject to *all* oil and gas conservation laws of [the State of] Oklahoma; *Provided*, That no order of the Corporation Commission affecting restricted Indian land shall be valid as to such land until submitted to and approved by the Secretary of the Interior or his duly authorized representative." (Emphasis added).

No affirmative statutory enactment was necessary for Oklahoma to assume jurisdiction abrogated by the federal government.

The United States Supreme Court in *Organized Village of Kake v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962), in an opinion by Mr. Justice Frankfurter, construed an Alaskan conservation law, in light of a Constitutional provision similar to Oklahoma's Article 1, Sec. 3. Indian communities brought an action against the Governor of Alaska to enjoin enforcement of the Alaska Anti–Fish Trap Conservation Law.

The principal dispute concerned, ". . . the meaning of § 4 of the Statehood Act, in which the State disclaimed all right and title to and the United States retained 'absolute jurisdiction and control' over, inter alia, 'any lands or other property . . ., the right or title to which may be held by any Indians . . .' or is held by the United States in trust for said natives." *Organized Village of Kake, supra,* 82 S.Ct. at p. 565.

The Court states further 82 S.Ct. at page 567, that:

Although the reference to fishing rights is unique, the retention of 'absolute' federal jurisdiction over Indian lands adopts the formula of nine prior statehood Acts. Indian lands in Arizona remained 'under the absolute jurisdiction and control' of the United States, 36 Stat. 557, 569; yet in *Williams v. Lee*, 358 U.S. 217, 220, 223, 79 S.Ct. 269, 270, 272, 3 L.Ed.2d 251, we declared that the test of whether a state law could be applied on Indian reservations there was whether the application of that law would interfere with reservation self government. The identical language appears in Montana's Admission Act, 25 Stat. 676, 677, yet in *Draper v. United States*, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419, the Court held that a non–Indian who was accused of murdering another non–Indian on a Montana Reservation could be prosecuted only in the state courts. * * *

*Draper* and *Williams* indicate that '*absolute*' *federal jurisdiction* is *not* invariably *exclusive jurisdiction.* (*Organized Village of Kake, supra.*) (Emphasis added).

Oklahoma's disclaimer of right and title to Indian lands is a disclaimer of proprietary rather than governmental interests. " 'The State may well waive its claim to any right or title to the lands and still have all of its political or police power with respect to the actions of the people on those lands, as long as that does not affect the title to the land.' " *Kake, supra.*

We hold that the power of the Corporation Commission to regulate oil and gas conservation measures under the laws of the state on restricted Indian lands and order appellant to replug purging wells, is not precluded by the federal jurisdiction.

Our Constitutional mandate contained in O.S.1971 Art. 1 Sec. 3 stating that Indian lands "shall be and remain subject to the jurisdiction, disposal, and control of the United States", envisions undiminished and not exclusive jurisdiction. We so hold.

BARNES, SIMMS, DOOLIN and HARGRAVE, JJ., concur.

LAVENDER, C. J., and OPALA, J., concur by reason of stare decisis.

HODGES, J., dissents.