Wilson and Mildred AHBOAH,
Appellants,

v.

The HOUSING AUTHORITY OF the
KIOWA TRIBE OF INDIANS,
Appellee.

Robert SAUMTY, Appellant,

v.

The HOUSING AUTHORITY OF the
KIOWA TRIBE OF INDIANS,
Appellee.

Nos. 53646, 53645.

Supreme Court of Oklahoma.

March 1, 1983.

Legal Aid of Western Okl., Inc., Errol A. Summerlin, Lawton, Stan L. Foster, Oklahoma City, for appellants.

Godlove, Joyner, Meyers & Mayhall, Inc., Lawton, for appellee.

G. William Rice, F. Browning Pipestem, Norman, for amicus curiae.

DOOLIN, Justice:

The appeals arise from judgments in forcible entry and detainer actions brought in the District Court of Caddo County, L.O. Thomas, Special Judge. The cases are consolidated on appeal as presenting substantially the same factual situation and common issues of law.

Appellant Robert Saumty is a duly enrolled member of the Kiowa Tribe. Appellants Wilson and Mildred Ahboah are duly enrolled members of the Kiowa and Wichita Tribes respectively.[1] Robert Saumty and Mildred Ahboah ("Allottees") are also the beneficial owners of individual allotments held in trust for them by the United States government.

With the permission of the Secretary of the Interior, allottees entered into long term leases of their allotted lands with Appellee, the Housing Authority of the Kiowa Tribe of Indians ("Housing Authority"), a state agency.[2] The tracts, with improvements, were leased back to the respective Allottees as residences, again with the approval of the Secretary of the Interior.

In January 1979, the Housing Authority brought forcible entry and detainer actions against both Allottees for past due rent and possession. Allottees moved to dismiss for lack of jurisdiction and to quash summons. Alternatively, they sought joinder of the United States as a necessary party defendant. On denial of Allottees' motions, stipulated judgments were entered against them.[3] These appeals followed.

Allottees' major contention is that individual trust allotments constitute "Indian Country" and, as such, are subject to federal and tribal jurisdiction to the exclusion of state jurisdiction. They argue that the State of Oklahoma has not taken the steps to assume jurisdiction required by Public Law 280.[4] Further, as individual trust allotments are not within the State's territorial jurisdiction, state process served within Indian Country is insufficient to bring Allottees within the authority of state courts.

The Housing Authority denies that individual trust allotments are "Indian Coun-

---

1. The record suggests that Mrs. Ahboah is also a member of the Kiowa Tribe, but this is far from clear.

2. The Housing Authority was created pursuant to 63 O.S.1981, § 1057.

3. The trial court concluded that it had jurisdiction without advancing the theory behind its decision.

4. Simply stated, Public Law 280, Act of August 15, 1953, Ch. 505, 67 Stat. 588 and amended by Public Law 90–284, Act of April 11, 1968, 82 Stat. 80, sets forth the conditions under which a state may assume civil and/or criminal jurisdiction over Indians and Indian activities in Indian Country. Public Law 280 as amended is codified at 25 U.S.C. §§ 1321–1326, 28 U.S.C. § 1360.

try" and therefore subject to federal or tribal jurisdiction. The transactions are characterized as contracts between a state agency and individuals who happen to be Indians. Thus, no question of Indian law arises. Further, even if the allotments can be characterized as "Indian Country," the creation of Indian housing authorities as state agencies met the requirements of Public Law 280 to confer state jurisdiction over forcible entry and detainer actions involving allotments leased by the Housing Authority.

The Kiowa Tribe, as amicus curiae, assert tribal jurisdiction over these actions based on: (1) inherent tribal sovereignty; (2) the status of allotments as Indian Country, and more particularly, as property of tribal members; and (3) previous exercise of tribal jurisdiction over similar matters in tribal court (the Court of Indian Offenses, Anadarko Area office, with jurisdiction over several tribes). The Tribe argues that the exercise of state jurisdiction over these actions would impermissibly infringe upon its right of self-government.

Upon careful consideration of the record and all pertinent statutes, treaties and regulations, we reverse, finding the District Court's order void for want of jurisdiction.

## I. INDIAN COUNTRY

For over 150 years, federal, state and tribal governments have struggled for control of tribal members and their property. The touchstone for allocating authority among the various governments has been the concept of "Indian Country," a legal term delineating the territorial boundaries of federal, state and tribal jurisdiction. Historically, the conduct of Indians and interests in Indian property within Indian Country have been matters of federal and tribal concern. Outside Indian Country, state jurisdiction has obtained.[5]

"Indian Country" is defined in 18 U.S.C. § 1151, providing in part:

> Except as otherwise provided ... the term 'Indian Country' ... means ... (c) *all Indian allotments, the Indian titles to which have not been extinguished* ... (Emphasis supplied).

Indian allotments are lands owned by individual Indians either held in trust by the United States or subject to statutory restrictions on alienation.[6] While 18 U.S.C. § 1151 ostensibly applies only to issues of criminal jurisdiction, the United States Supreme Court has recognized its general applicability to questions of civil jurisdiction.[7]

Although the trust allotments in these cases appear to be included within "Indian Country" as defined by 18 U.S.C. § 1151(c), the Housing Authority advances two arguments against such a conclusion. First, cession of tribal lands by the Treaty of October 21, 1892[8] extinguished all tribal title to and interest in subsequently allotted lands, thereby removing all Kiowa allotments from the scope of § 1151(c). Second, the subject matter of these suits are leases of allotted lands, rather than the allotments themselves. We find neither argument persuasive.

The Housing Authority's first argument rests on the language found in Article I of the Treaty:

> Subject to the allotment of land, in severalty to the individual members of the Comanche, Kiowa and Apache tribes of Indians in the Indian Territory, ... *the said Comanche, Kiowa and Apache Indians hereby cede, convey, transfer, relinquish and surrender, forever and absolutely, without any reservation whatever,*

---

**5.** Felix S. Cohen's Handbook of Federal Indian Law (1982 ed.) pp. 27–44. (Hereinafter referred to as "Cohen").

**6.** 25 U.S.C. §§ 331–358; *United States v. Ramsey,* 271 U.S. 467, 46 S.Ct. 559, 70 L.Ed. 1039 (1926); *United States v. Pelican,* 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914).

**7.** *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 478, 479, 96 S.Ct. 1634, 1643–44, 48 L.Ed.2d 96 (1976); *Decoteau v. District County Court,* 420 U.S. 425, 427, 95 S.Ct. 1082, 1084, 43 L.Ed.2d 300 (1975) n. 2; *McClanahan v. Arizona Tax Comm'n.,* 411 U.S. 164, 177, 178, 93 S.Ct. 1257, 1265, 36 L.Ed.2d 129 (1973) n. 17.

**8.** (Ratified June 6, 1900) 31 Stat. 676.

*express or implied, all their claim, title, and interest of every kind and character, in and to the lands embraced* [within the Comanche-Kiowa-Apache reservation]. (Emphasis supplied).[9]

The Housing Authority interprets this language as a total cession of all tribal interest in the reservation to the federal government, which operated to totally extinguish the Indian character of the land.

The Treaty incorporated by reference [10] the terms of the General Allotment Act of 1887,[11] which made individual allottees subject to the civil and criminal laws of the state or territory in which they resided once the allotments were made and trust patents issued. The Act was amended in 1906 to postpone the operation of state or territorial jurisdiction until the expiration of the trust period and issuance of fee simple patents.[12] The Housing Authority concedes that the trust status of the allotments in question has been duly extended by executive order and no fee simple patents have been issued. However, it argues that the terms of the General Allotment Act of 1887 control, as the Kiowa Tribe agreed to the allotments and the reservation was disestablished prior to the 1906 amendment. Thus, the allotments were subject to exclusive territorial jurisdiction when made and jurisdiction was transferred to the State of Oklahoma *in toto* on statehood. The Housing Authority finds support for its position in *Ellis v. Page,* 351 F.2d 250, 252 (10th Cir.1965); *Tooisgah v. United States,* 186 F.2d 93 (10th Cir.1950) and *Ellis v. State,* 368 P.2d 326 (Okl.Cr.1963).

■ The Housing Authority's position is untenable as it ignores dispositive holdings of the United States Supreme Court. A similar argument was made and rejected in *United States v. Nice,* 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192 (1916). The Supreme Court noted that only Congress had the authority to terminate tribal relations and divest the federal government of jurisdiction over trust allotments and allottees. See 241 U.S. at 600, 36 S.Ct. at 698–99. That Court held provisions for continuing federal supervision of allotted lands and Indian activities showed no Congressional intent to terminate tribal relations immediately by enacting the General Allotment Act of 1887. *Id.* The grant of citizenship was found not to be incompatible with continuing tribal relations and the wardship status of Indians. See 241 U.S. at 596, 36 S.Ct. at 697. Thus, trust allotments remain under the exclusive jurisdiction and control of Congress during the trust period for all purposes relating to the guardianship and protection of Indians. *United States v. Pelican,* 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914). See also *Bowling v. United States,* 233 U.S. 528, 34 S.Ct. 659, 58 L.Ed. 1080 (1914); *United States v. Sutton,* 215 U.S. 291, 30 S.Ct. 116, 54 L.Ed. 200 (1909); *In re Celestine,* 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195 (1909); *United States v. Rickert,* 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903).

■ Moreover, the Housing Authority errs in assuming that trust allotments must be within a continuing reservation to retain their Indian character.[13] Individual trust allotments have long been recognized as

---

**9.** Treaty of October 21, 1892 (ratified June 6, 1900) 31 Stat. 676.

**10.** Treaty of October 21, 1892, Article V, which provides:

"When said allotments of land shall have been selected and taken as aforesaid, and approved by the Secretary of the Interior, the titles thereto shall be held in trust ... in the time and manner and to the extent provided for in the [General Allotment Act identified by title] approved February 8, 1887 ..."

**11.** Act of February 8, 1887, Ch. 119, 24 Stat. 390.

**12.** Act of May 8, 1906, 34 Stat. 182, codified at 25 U.S.C. § 349.

**13.** The cases, two Ellis cases and Tooisgah, supra, cited by the authority are not on point. Each involved a challenge to state or federal jurisdiction under a federal statute predicating federal jurisdiction on the commission of certain crimes by Indians on a *reservation.* The issue in the cases was whether a reservation had been disestablished by a cession of tribal lands to the federal government when individual trust allotments were retained. The status of the allotments as Indian Country was not in issue.

Indian Country, whether within or without continuing reservation boundaries. *Decoteau v. District County Court,* 420 U.S. 425, 427, 95 S.Ct. 1082, 1084, 43 L.Ed.2d 300 (1975) n. 2.[14] See also *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *United States v. Pelican,* 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914). The test, as articulated by the Supreme Court, is whether the land in question has been "validly set apart for the use of the Indians as such, under the superintendence of the Government." *Pelican,* supra, 232 U.S. at 449, 34 S.Ct. at 399.

■ We also reject the Housing Authority's argument that the lease of allotted lands somehow deprived them of their Indian character. Extensive federal regulation[15] of the leasing of allotments, even to non-Indian lessees, shows Congressional intent that the leased allotments remain Indian Country. Also, the Supreme Court has held that an interest in Indian lands in less than fee simple, held by a non-Indian, does not deprive the lands of their Indian character. *United States v. Soldana,* 246 U.S. 530, 38 S.Ct. 357, 62 L.Ed. 870 (1918), [right-of-way easement across a reservation.]

## II. STATE JURISDICTION

Identification of the individual trust allotments involved in these appeals as Indian Country only resolves the threshold issue of territorial jurisdiction. The question of subject matter jurisdiction remains.

■ Although making generalizations about the allocation of subject matter jurisdiction between federal, state and tribal governments is treacherous, certain general principles are clear. Congress has plenary power over Indians and Indian activities by virtue of the Indian commerce clause[16] and supremacy clause[17] of the United States Constitution. Federal power over Indian activities has always been exercised broadly, subject to few limitations.[18]

■ Tribal authority over tribal members and their property is derived either through the doctrine of inherent sovereignty (Indian nations) or, as more recently articulated, from the protection afforded to tribal self-government by Congress. *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980).

■ As a general principle, states have full authority over Indians and Indian activity outside Indian Country. Within Indian Country, state jurisdiction may be exercised only if the field has not been preempted by federal statutes, regulations and policy, and tribal authority has not been determined.[19] In areas traditionally within the federal ambit, states may exercise authority over Indians or Indian Country only with the explicit consent of Congress.[20]

**14.** In *Decoteau,* the Supreme Court noted that "isolated tracts of 'Indian Country' man be scattered checkerboard fashion over a territory otherwise under state jurisdiction." 420 U.S. 425, 429, 95 S.Ct. 1082, 1085, 43 L.Ed.2d 300 (1975) n. 3.

**15.** 25 C.F.R. § 131.1 et seq.

**16.** United States Constitution, Art. 1., § 8.

**17.** United States Constitution, Art. VI.

**18.** Restrictions on federal power over Indians arise primarily from the Constitution and from the federal government's fiduciary duty to Indians. See Cohen, pp. 217–221.

**19.** "State laws have been permitted to apply to activities on Indian reservations where specifically authorized by acts of Congress, or where they clearly do not interfere with federal policies concerning the reservations." *Warren*

*Trading Post Co. v. Ariz. Tax Comm'n.,* 380 U.S. 685, 687, 85 S.Ct. 1242, 1243, 14 L.Ed.2d 165 (1965) n. 3. Recent Supreme Court cases discussing allocation of authority when a state has not assumed jurisdiction under Public Law 280 have emphasized the Congressional policy of fostering tribal autonomy. *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico,* 455 U.S. 934, 102 S.Ct. 1420, 71 L.Ed.2d 644 (1982); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

**20.** *Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976). See also *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation,* 439 U.S. 463, 484, 99 S.Ct. 740, 753, 58 L.Ed.2d 740 (1979); *Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). Regulation of Indian allotments is clearly within the scope of federal power.

Public Law 280 [21] embodies express Congressional consent to state assumption of civil and/or criminal jurisdiction over Indians and Indian activities within Indian Country, provided that certain conditions are met. Public Law 280 has appeared in two forms. As originally enacted, states were divided into two groups: mandatory states (those required to assume civil and criminal jurisdiction) [22] and optional states (which could voluntarily assume jurisdiction by affirmative legislative action). [23] The optional states were further divided into two groups: those whose constitutions and enabling acts disclaimed all title to and interest in Indian lands within state borders and those states having no such disclaimer. Congress perceived that disclaimer clauses presented a barrier to the assumption of jurisdiction. The barrier presented by the enabling acts was removed by Congress, [24] but disclaimer states were required to amend their constitutions "where necessary" as well as to take affirmative legislative action to assume jurisdiction. [25] Oklahoma is among the disclaimer states. [26]

Public Law 280 was amended by the Civil Rights Act of 1968 [27] in two significant ways: first, the affirmative legislative action requirement was removed; second, consent by tribal referendum was required before state jurisdiction could be assumed. The Kiowa Tribe has not assented to the assumption of jurisdiction by the State of Oklahoma. Therefore Oklahoma to assume jurisdiction under Public Law 280 must have done so under the original 280 Act before the amendment by the Civil Rights Act of 1968. [28]

With this background in mind, we turn now to the issue of whether the State of Oklahoma has assumed jurisdiction over forcible entry and detainer actions seeking possession of leased trust allotments.

### A.

■■■ Allottees first argue that the disclaimer clause of the Oklahoma Constitution presents a barrier to the assumption of jurisdiction which can only be removed by Constitutional amendment. The Supreme Court has determined that the extent to which a state constitution provides a barrier to the assumption of jurisdiction is a question for the particular state. *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation,* 439 U.S. 463, 493, 99 S.Ct. 740, 757, 58 L.Ed.2d 740 (1979). This Court recently considered the matter in *Currey v. Corporation Commission,* 617 P.2d 177 (Okl.1980). *Currey* presented the question of whether the disclaimer clause of the Oklahoma Constitution prevented the Corporation Commission from ordering the replugging of an abandoned well on Choctaw property. The federal government had explicitly made the Five Civilized Tribes (which include the Choctaws) subject to Oklahoma oil and gas conservation law. [29] We interpreted the disclaimer clause as a "disclaimer of proprietary rather than governmental interests." *Currey,* 617 P.2d 180. Thus, the State of Oklahoma retains full authority over persons and property within its territorial boundaries. This authority, however, may not be exercised where preempted by federal law. Clearly, the disclaimer clause in the Oklahoma Constitution presents no barrier to the adjudication of

---

**21.** Act of August 15, 1953, Ch. 505, 67 Stat. 588 amended by Public Law 90–284, Act of April 11, 1968, 82 Stat. 80.

**22.** 18 U.S.C. § 1162(a); 28 U.S.C. § 1360(a).

**23.** 25 U.S.C. §§ 1321–1322, 1326.

**24.** 25 U.S.C. § 1324.

**25.** Id.

**26.** Oklahoma was included in the disclaimer state classification on the basis of its Enabling

Act, Act of June 16, 1906, 34 Stat. 267 and Art. I, § 3 of its constitution.

**27.** Public Law 90–284, Act of April 11, 1968, 82 Stat. 80.

**28.** The effective date of 63 Okla.Stat. § 1057 was June 18, 1965.

**29.** *Currey v. Corp. Comm'n.,* 617 P.2d 177, 180, citing Public Law 80–366 § 11, Act of August 4, 1947, Ch. 458, 61 Stat. 731.

forcible entry and detainer actions involving Indians and Indian property in and of itself, for such act is governmental.

### B.

To determine if the other conditions imposed by the original enactment of Public Law 280, have been met, we must examine the pertinent federal and state enactments. Section 4 of Public Law 280, which described the jurisdiction which could be assumed, provided in part:

> (a) ... jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in Indian country ... to the same extent that the state has jurisdiction over other civil causes of action and those civil laws ... that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the state.

> (b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property ... belonging to any Indian or any Indian tribe, band or community that is held in trust by the United States ... or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the state to adjudicate, in probate or otherwise, the ownership or right to possession of such property or any interest therein.

Section 7, which applied to option states, including Oklahoma, provided:

> The consent of the United States is hereby given to any other state not having jurisdiction with respect to ... civil causes of action ... to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof.

The Housing Authority argues that 63 O.S.1981, § 1057 meets the requirements imposed by original Public Law 280 because: (1) it is affirmative legislative action within the meaning of § 7, supra; (2) it is a civil law of "general application to private persons or private property" within the meaning of § 4(a), supra; and (3) it is not within the exceptions provided by § 4(b), supra.

▮▮▮▮ The Supreme Court has provided some guidance in interpreting the terms of original Public Law 280. A primary canon of construction of Indian law is that ambiguous provisions are to be construed for the benefit of Indians.[30] Consequently, Congressional intent to diminish or delegate its trust responsibility to Indians is not to be lightly inferred.[31] In light of this canon, the Supreme Court has taken a very narrow and strict view of Public Law 280.

First, the Court has required strict compliance with the procedural provisions of Public Law 280 both before and after the Civil Rights Act of 1968. *Kennerly v. District Court,* 400 U.S. 423, 424–425, 91 S.Ct. 480, 481, 27 L.Ed.2d 507 (1970). In *Kennerly,* the Court stated:

> Nor was the requirement of affirmative legislative action an idle choice of words; the legislative history of the 1953 statute shows that the requirement was intended to assure that state jurisdiction would not be extended until the jurisdictions to be responsible for the portion of Indian country concerned manifested by political action their willingness and ability to discharge their new responsibilities.[32]

In *Kennerly,* the Court rejected the State of Montana's claim of jurisdiction over a debt action against a reservation Indian, even though the tribe, through legislative action, had consented to such an assumption of

---

**30.** *DeCoteau v. District County Court,* 420 U.S. 425, 444, 95 S.Ct. 1082, 1092–93, 43 L.Ed.2d 300 (1974); *United States v. Nice,* 241 U.S. 591, 598, 36 S.Ct. 696, 698, 60 L.Ed. 1192 (1915).

**31.** *DeCoteau,* 420 U.S. at 444, 95 S.Ct. at 1092–93; *Nice,* 241 U.S. at 596, 36 S.Ct. at 697.

**32.** *Kinnerly,* 400 U.S. at 427, 91 S.Ct. at 482.

jurisdiction, because Montana had not taken specific steps to assume civil jurisdiction under the 1953 act. See 400 U.S. at 427, 91 S.Ct. at 482. This position was reaffirmed in *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation,* 439 U.S. 463, 493, 99 S.Ct. 740, 757, 58 L.Ed.2d 740 (1979). While the Court did not define the type of positive action required by § 7, its approval of the form of the Washington statute [33] as being in conformity with Congressional intent strongly suggests that a recital of a state's willingness and ability to assume responsibility for Indians will be an important, although perhaps not decisive, factor in determining whether a state has successfully assumed jurisdiction.

The Supreme Court has also stated that while Public Law 280 is clearly an assimilationist measure, it is not intended to immediately terminate tribal government. *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation,* 439 U.S. at 488–89 fn. 32, 99 S.Ct. 755–56 fn. 32. Section 4(b) of the act, setting forth the areas over which states may not assume jurisdiction, has been broadly interpreted as a "reaffirmance of the existing reservation [34] Indian-Federal Government relationship in all respects save the conferral of state-court jurisdiction to adjudicate private civil causes of action involving Indians." *Bryan v. Itasca County,* 426 U.S. 373, 391, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1975). In *Bryan,* the State of Minnesota attempted to levy a tax against a reservation Indian for personal nontrust property located on trust land. In rejecting Minnesota's claim, the Court interpreted Congressional intent as requiring a narrow interpretation of § 4(a) [conferring jurisdiction] rather than as granting broad powers to the states except where limited by the literal language of § 4(b). See 426 U.S. 389–90, 96 S.Ct. at 2111. The Court found this interpretation consistent with the canon of construction applied to statutes affecting Indians as Indians. See 426 U.S. at 381, 96 S.Ct. at 2107.

Section 1057 of 63 O.S.1981 provides in part:

There is hereby created, with respect to each Indian tribe, band, or nation in the state, a public body corporate and politic, to function in the operating area of such Indian tribe, band, or nation to be known as the 'housing authority' of said Indian tribe, band, or nation, which shall be an agency of the State of Oklahoma, possessing all powers, rights, and functions herein specified for city and county authorities created pursuant to this act . . .

City and county authorities are granted all powers necessary or convenient to carry out and effectuate the purposes of the Oklahoma Housing Authorities Act,[35] which includes the power to sue and be sued. See 63 O.S.1981, § 1061(a). We note that Congress has expressly authorized the creation of Indian housing authorities by state legislative act. See 25 C.F.R. § 261.6(b). Such housing authorities are endowed with all necessary legal powers to carry out low income housing projects for Indians. See 25 C.F.R. § 805.109.

Nonetheless, we are unable to conclude that either the Oklahoma Legislature or the United States Congress intended that Indian trust lands be subject to forcible entry and detainer actions in state court. We are unable to find any evidence that the Oklahoma Legislature intended that the power of the Indian housing authorities to sue be

33. Wash.Rev.Code § 37.12.010 (1976), which expressly excluded allotments from the assumption of civil and criminal jurisdiction with enumerated exceptions relating to the family law, health and welfare areas.

34. Most cases discuss allocation of jurisdiction in terms of Indian conduct on an Indian reservation. In light of the inclusion of trust allotments within the meaning of "Indian Country" in 18 U.S.C. § 1151 and the Supreme Court's recognition that individual trust allotments

owned by tribal members could constitute a sufficient property base for the exercise of tribal jurisdiction (*Decoteau v. District County Court,* 420 U.S. at 446, 95 S.Ct. at 1094), we see no basis for distinguishing between individual trust allotments and reservations in terms of jurisdiction. Public Law 280 § 4(a) also speaks of transfer of jurisdiction in terms of "Indian Country."

35. 63 O.S.1981, § 1050 et seq.

extended to trust lands. The Legislature spoke in terms of conferring upon the Indian housing authorities all of the powers enjoyed by municipal and county authorities. Certainly, city and county authorities have never enjoyed the power to litigate issues of ownership and possession of federal lands. The Indian housing authority statute is barren of any specific expression of willingness and ability to assume responsibility over trust lands, a factor identified as important by the Supreme Court.

Moreover, given the standards of interpretation of Public Law 280 §§ 4(a) and (b) discussed previously, we cannot believe that the United States intended to grant states authority over trust property. The specific prohibition of the assumption of jurisdiction to "adjudicate, in probate or otherwise, the ownership or right to possession of [trust] property"[36] indicates the contrary. Legislative history somewhat supports the view that Public Law 280 did not oust federal and tribal control over allotments.[37] Certainly the Secretary of the Interior is convinced that this is the proper interpretation of Public Law 280.[38]

We must also note that federal approval of state-created Indian housing authorities does not imply delegation of jurisdiction over trust allotments. State created housing authorities are granted only those powers necessary to implement low income housing projects for Indians. See 24 C.F.R. § 805.109. The power to sue Indian tenants for possession is not necessary to implement Indian housing projects for the power to terminate possession remains in the Secretary of Interior.[39]

We are unaware of any state assumption of jurisdiction to adjudicate disputes involving trust property. The Alaska Supreme Court has expressly found that such an assumption of jurisdiction is improper.[40] It interpreted § 4(b) of Public Law 280 as reserving federal jurisdiction over any disputed interest in trust lands. *Heffle v. State,* 633 P.2d 264 (Alaska, 1981). Alaska has also found state courts do not have authority to adjudicate a dispute over personalty held in trust by the United States. *Calista Corp. v. Mann,* 564 P.2d 53 (Alaska 1977). The proceeds from oil leases of trust land are a sufficient interest in the trust property to preclude the exercise of state court jurisdiction. *Ollestead v. Native Village of Tyonek,* 560 P.2d 31 (Alaska 1977), *cert. denied* 434 U.S. 938, 98 S.Ct. 426, 54 L.Ed.2d 297. We find particularly cogent the explanation of a federal district court:

> Indian trust lands are a federal instrumentality held to effect the federal policy of Indian advancement, and therefore

---

**36.** Public Law 280 § 4(b).

**37.** C. Goldberg, Public Law 280: State Jurisdiction Over Reservation Indians (1975).

**38.** The Secretary of the Interior has the authority to promulgate regulations under 5 U.S.C. § 301; 25 C.F.R. § 1.4(a) provides:

> (a) ... none of the laws, ordinances, codes, resolutions, rules or other regulations of any state or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property ... shall be applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe, band, or community that is held in trust by the United States or is subject to restriction on alienation imposed by the United States.

**39.** 25 C.F.R. § 131.5(b)(1) allows adult Indian owners of trust land to lease their land for public purposes at a nominal rent. However, all leases must be in a form approved by the Secretary of the Interior and he must assent to the lease in writing. 25 C.F.R. § 131.5(a). Lessees of trust property are obligated under the lease to the United States as well as to the Indian owner. 25 C.F.R. § 131.5(g)(1). Sublessees assume the obligations under the lease to the United States and the allottee owned by their lessor. 25 C.F.R. § 131.12(b). A lease may not be terminated without a showing satisfactory to the Secretary that a violation has occurred. 25 C.F.R. § 131.14. The Secretary has the authority to approve or accept a settlement for damages resulting from breach of the lease of trust property. Id.

**40.** Alaska's position is particularly interesting in that it was included among mandatory Public Law 280 states which were granted immediate jurisdiction without any need for affirmative action. Public Law 280 § 2 conferred jurisdiction on the mandatory states. Alaska was added by Act of August 8, 1958, Public Law 85–615, § 1, 72 Stat. 545.

may not be burdened or intervened with by the State ... Where a dispute involves trust or restricted property, the state may not adjudicate the dispute nor apply its laws.

*In re Humbolt Fir, Inc.,* 426 F.Supp. 292, 296 (N.D.Cal.1977).

### III

In sum, we find that neither Public Law 280 nor 63 O.S.1981, § 1057 authorizes Oklahoma adjudicatory jurisdiction over disputes involving Indian trust property. Our holding obviates the need to resolve the issues of the validity of service or the necessity of joinder of the United States as a party defendant. The issue of tribal court jurisdiction pursuant to federal treaty, statute or regulation is not for this Court to decide.

REVERSED.

BARNES, C.J., SIMMS, V.C.J., and LAVENDER, HARGRAVE, OPALA and WILSON, JJ., concur.