NARRAGANSETT INDIAN TRIBE OF RHODE ISLAND and Narragansett Indian Wetuomuck Housing Authority, Plaintiffs,

v.

The NARRAGANSETT ELECTRIC COMPANY, Defendant,

and

The State of Rhode Island and The Town of Charlestown, Defendants–Intervenors.

Civ. A. No. 93–667–T.

United States District Court, D. Rhode Island.

Feb. 21, 1995.

---

John F. Killoy, Wakefield, RI, for plaintiffs.

Andrew B. Prescott, Tillinghast, Collins & Graham, Ronald T. Gerwatowski, C/O Narragansett Elec. Co., Fred A. Kelly, Jr., Randall L. Souza, Peter V. Lacouture, Peabody and Brown, Providence, RI, for defendant.

W. Mark Russo, Adler Pollock & Sheehan, Alan M. Shoer, Atty. Gen.'s Office, James E. Purcell, Steven E. Snow, Patridge, Snow & Hahn, Elizabeth Murdock Myers, Executive Counsel, State of R.I., Providence, RI, for defendants-intervenors.

### *DECISION AND ORDER*

TORRES, District Judge.

This case is before the Court for consideration of the defendant-intervenors' request for a permanent injunction prohibiting the plaintiffs from constructing a housing complex without first obtaining the various permits and approvals mandated by state law and local ordinances. In passing on that request, the Court is required to address the extent to which a state's civil regulatory jurisdiction extends to the development of land owned by an Indian tribe. That issue is one of first impression in this circuit and one on which there is very little authority.

An evidentiary hearing was held regarding the defendant-intervenors' motion for a preliminary injunction and the parties have, since, stipulated that the evidence presented at that hearing may serve as the basis for the Court's decision regarding the request for a permanent injunction. It should be noted that the request for a permanent injunction relates only to that aspect of the case dealing with construction of the housing complex. The remaining portions of the case, dealing with proposed construction on an adjacent

parcel of land and whether the defendant utility company is required to provide electric service for these projects, are not yet ripe for decision.

## BACKGROUND

### I. The Historical Framework

In the mid–1970s, the Narragansett Indian Tribe (the Tribe) asserted title to certain lands in Charlestown, Rhode Island, claiming that the Tribe's aboriginal title to those lands never had been extinguished. See, *Town of Charlestown v. United States*, 696 F.Supp. 800, 801–05 (D.R.I.1988) (recounting history of dispute), *aff'd* 873 F.2d 1433 (1st Cir.1989). In 1978, the Tribe, the State of Rhode Island (the State) and the Town of Charlestown (the Town) settled those claims by entering into a Joint Memorandum of Understanding (J–MEM) in which the Tribe agreed to relinquish its title claims in exchange for a sum of money and approximately 1,800 acres of land (the settlement lands) that were to be set aside for the Tribe. Congress implemented the settlement agreement by enacting the Rhode Island Indian Claims Settlement Act of 1978, 25 U.S.C. § 1701 *et seq.*, (the Settlement Act) "which, for the most part tracks the [Joint Memorandum]." *State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 689 (1st Cir.1994).

The Settlement Act authorizes the Tribe "to establish its own regulations concerning hunting and fishing on the settlement lands," 25 U.S.C. § 1706(a)(3), and exempts the settlement lands, but not income producing activities occurring on them, from "any form of Federal, State, or local taxation." 25 U.S.C. § 1715(a)–(b).[1] However, the Settlement Act also stated that "except as otherwise provided in this Act ... the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island."

25 U.S.C. § 1708. The Settlement Act did not specifically address a provision in the J–MEM requiring that development on the settlement lands be governed by a land use plan mutually acceptable to the Tribe and the Town, which plan was to be prepared pursuant to the Rhode Island Comprehensive Planning and Land Use Regulation Act. J–MEM ¶ 14. Although the Tribe received a grant from the State for that purpose, as yet, no such plan has been prepared.

In *State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d at 700–06, the Court of Appeals had occasion to construe the jurisdictional provisions of the Settlement Act in the context of the Tribe's proposal to construct a gambling casino on the settlement lands. The Court held that, insofar as gaming activity was concerned, the jurisdiction conferred on the State was subject to the provisions of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, 18 U.S.C. §§ 1166–1168, (IGRA), which exempts the settlement lands from state gambling laws except to the extent provided in IGRA. *Id.* 19 F.3d at 704–05.[2] The Court also held that the State's regulatory authority over other activities occurring on the settlement lands was not exclusive and that, in accordance with the doctrine of Indian sovereignty, the Tribe retains concurrent jurisdiction, particularly with respect to matters of local government. *Id.* at 701–03. However, the precise nature of that concurrent jurisdiction was left for future determination. *Id.* at 705.

### II. The Housing Site

The parcel of land that is the subject of the defendant-intervenor's request for a permanent injunction in this case (the "housing site") is adjacent to, but not part of, the settlement lands. It is separated from the settlement lands by a town road. The land

---

**1.** These provisions of the Settlement Act apply specifically to the State-chartered, Indian-controlled corporation that was created to hold the settlement lands for the benefit of the Tribe. After the Tribe had been officially recognized by the Secretary of the Interior, the corporation conveyed the settlement lands to the Tribe. Consequently, it would appear that these provisions now apply to the Tribe. *See Town of Charlestown v. United States*, 696 F.Supp. at 804.

**2.** The Court of Appeals affirmed the issuance of a mandatory injunction compelling the State to commence good faith negotiation of a "Tribal-State Compact" pursuant to the requirements of IGRA. Since then, a compact has been executed but its validity is now being challenged in this Court. See, Memorandum and Order dated January 20, 1995 in *State of Rhode Island and Jeffrey B. Pine v. The Narragansett Indian Tribe*, CA No. 94-619.

was purchased by the Wetuomuck Housing Authority (WHA) in 1991 from a private developer, Gilbert and Blackwell, Ltd.

At the time the housing site was purchased, it had been platted and approved by the Town for the construction of eleven single-family residences. In the course of the approval process, a road was built that since has been accepted as a town road. In addition, Gilbert and Blackwell had conveyed to the Town a drainage easement designed to accommodate the runoff of surface water from the road.

In 1990, development of the plat was stalled when the Tribe sued Gilbert and Blackwell in this Court seeking to enjoin construction. In that suit, the Tribe, through its spokesman, John Brown, alleged, among other things, that proposed individual sewage disposal systems (ISDS systems) would pollute underground water supplies on the settlement lands and that excavation would destroy Indian burial grounds and archaeologically significant artifacts protected by federal law. *See Narragansett Indian Tribe, et al. v. Maynard,* Civ. No. 90-345. Inasmuch as no evidence was presented to support those claims, this Court rejected them and dismissed the Tribe's suit. Shortly after that, the WHA purchased the housing site from Gilbert and Blackwell.

### FACTS

The WHA was established by the Tribe and is recognized by the United States Department of Housing and Urban Development (HUD) as an Indian Housing Authority. HUD provided the financing necessary to purchase the housing site and construct the buildings. In addition, HUD will provide money to manage the project and subsidize the rents of occupants. Although occupancy is open to anyone, HUD funds have been made available pursuant to the Indian Housing Act of 1988, 42 U.S.C. § 1437aa, *et seq.* and 24 C.F.R. § 905.101 *et seq.* a program specifically designed to provide housing for Indians. Moreover, it is contemplated that most, if not all of the units, will be occupied by elderly and low-income members of the Tribe.

After purchasing the land, the WHA conveyed it to the Tribe with a deed restriction that it be placed in trust with the United States government for the purpose of affording housing to tribal members. The Tribe applied for trust status but its application has not, yet, been granted. In the meantime, the Tribe has leased the land back to the WHA for the purpose of constructing the project at issue. That lease was approved by the Bureau of Indian Affairs (the BIA).

As already noted, the housing site is adjacent to the Tribe's settlement lands. The Tribe's church, the long house which is the seat of the Tribal Assembly, and the offices where the tribal government meets and federal nutrition and Head Start programs for tribal members are administered all are located in close proximity to the housing site. In addition, the settlement lands are the site of a proposed tribal community center and tribal health center to be constructed with HUD grants.

The housing site is an area of approximately 32 acres and is located within the coastal zone designated in Rhode Island's federally approved Coastal Resources Management Program (CRMP). Moreover, the housing site is in a section of Charlestown zoned to require a minimum of two acres of land for each residential unit. Since the proposed project will contain 50 units, it falls far short of that requirement.

The WHA began construction of the housing complex without a building permit from the Town or state approval of the ISDS systems serving the project. Furthermore, the WHA failed to obtain any determination that the project is consistent with Rhode Island's CRMP or state regulations designed to preserve property of historical or archeological significance. In addition, excavation for the project has infringed on the Town's drainage easement and threatens to destroy it.

The WHA and the Tribe contend that no state permits or approvals are required because the housing complex is located on tribal land and state jurisdiction is precluded by the doctrine of Indian sovereignty. They also point out that the ISDS systems comply with regulations promulgated by the Indian

Health Service (IHS), an agency of the Department of Health and Human Services.

The IHS regulations utilize ISDS standards that have been adopted by the ten states surrounding the Great Lakes (the Ten State Standards). Those standards are less stringent than Rhode Island's but there is no evidence indicating that the Ten State Standards are insufficient to protect the drinking water supplies either on or off the housing site. Unfortunately, the record is silent regarding the differences, if any, between the State's building code and the Tribe's building code or what the significance of any such differences may be.

The evidence demonstrates that the housing site is in close proximity to Ninigret Pond, a fragile salt water estuary that is a prime spawning ground for several species of commercially important fish. Ninigret Pond is already ecologically stressed principally by the infiltration of nitrates in the ground water which lowers the oxygen content of the pond thereby adversely affecting both plant and fish life. There is, at least, a real possibility that nitrates added to the groundwater by the WHA's ISDS systems will flow into the pond and worsen an already serious problem.

The defendant-intervenors make, essentially, two arguments in support of their contention that construction of the proposed housing complex is subject to state and town regulation. First, they assert that, because the housing site was privately purchased by the WHA, it does not enjoy the same immunity from state regulation that is generally accorded to reservations or other lands specifically set aside by the federal government for Indian tribes. In addition, they argue that even if the housing site is considered to be a part of "Indian Country," it is subject to the state's civil regulatory jurisdiction because such jurisdiction is conferred by applicable federal statutes (e.g., the Safe Drinking Water Act, 42 U.S.C. § 300f and the Coastal Zone Management Act, 16 U.S.C. § 1455) and warranted by the project's significant off-site effects. The Tribe, on the other hand, contends that state regulation would infringe on its sovereignty and interfere with federal plans regarding use of the land.

*DISCUSSION*

## I. *Indian Country*

■ Generally speaking, a state has inherent power to regulate activities within its borders. However, when Indians are involved, the scope of that power depends, in part, on whether the activity takes place within or outside of "Indian country".

■ Absent express federal law to the contrary, state law applies to the activities of Indians beyond the boundaries of their reservations. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973); *Ahboah v. Housing Authority of Kiowa Tribe of Indians,* 660 P.2d 625, 629 (Okla.1983). On the other hand, when the activity is conducted on reservations, the applicability of state law turns on analysis of the respective, federal, tribal and state interests at stake. *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980); *Ahboah,* 660 P.2d at 629.

■ The Supreme Court has made it clear that the term "reservations" should be broadly construed to include all lands falling within the definition of "Indian country". *Oklahoma Tax Commission v. Sac and Fox Nation,* —— U.S. ——, ——, 113 S.Ct. 1985, 1992, 124 L.Ed.2d 30 (1993). Therefore, any assessment of a state's authority to regulate activity involving Indians must begin with a determination as to whether the situs of the activity is within Indian country.

■ Not all land owned or occupied by Indians is considered Indian country. Congress has defined Indian country to include:

a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, ... (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, ....

18 U.S.C. § 1151.

Although § 1151 was enacted for the purpose of delineating federal jurisdiction to

prosecute Indians for committing crimes, it also has been utilized for the purpose of determining the extent of a state's civil regulatory jurisdiction. *See Sac and Fox,* ——, U.S. at ——, 113 S.Ct. at 1991; *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 478–79, 96 S.Ct. 1634, 1643–44, 48 L.Ed.2d 96 (1976), *Ahboah,* 660 P.2d at 627. In that connection, the Supreme Court has said that Congress's intent "... was to designate as Indian country all lands set aside by whatever means for the residence of Tribal Indians under Federal protection, together with trust and restricted Indian allotments." *Sac and Fox,* —— U.S. at ——, 113 S.Ct. at 1991 (quoting F. Cohen, *Handbook of Federal Indian Law* (1982 ed.)).

While the settlement lands might be considered an informal reservation, it is clear that the housing site cannot. It is equally clear that the housing site is neither a formal reservation nor an Indian allotment. Consequently, the relevant inquiry is whether the housing site is a "dependent Indian community".[3]

The Court of Appeals for the First Circuit has held that a dependent Indian community is one which is "both 'Indian' in character and federally dependent." *United States v. Levesque,* 681 F.2d 75, 77 (1st Cir.1982). Like the Eighth and Tenth Circuits, it has prescribed "a functional inquiry into the nature of the community" which includes evaluating "the nature of the area ... the relationship of the inhabitants to Indian tribes ... [and] ... the relationship of the community with the federal government." *Id.* at 77–78 (citing *United States v. Martine,* 442 F.2d 1022 (10th Cir.1971); *United States v. South Dakota,* 665 F.2d 837 (8th Cir.1981)).

Some of the specific factors courts have considered in making that inquiry are whether the United States has retained title to the land and authority to regulate activity on it;

the established practice of government agencies toward the area; the degree of cohesiveness manifested by the inhabitants; and whether such lands have been set apart for the use of dependent Indians. *United States v. South Dakota,* 665 F.2d at 839. More specifically, several courts have found that federally funded housing projects located on land owned by Indians or held in trust for them and occupied primarily by Indians receiving some form of Federal assistance constitute dependent Indian communities. *United States v. Driver,* 945 F.2d 1410, 1415 (8th Cir.1991); *United States v. South Dakota,* 665 F.2d at 839–42; *United States v. Mound,* 477 F.Supp. 156 (D.S.D.1979); *Housing Authority of Seminole Nation v. Harjo,* 790 P.2d 1098 (Okla.1990).

In this case, the housing site is located in an area recognized by the BIA as one in which "a distinct [Indian] community has existed since earliest European contact." BIA Internal Memorandum on Acknowledgement of Narragansett Indian Tribe, July 1982, at 9. Although the United States does not hold title to the land and did not vest control over it in the Tribe, HUD has, in a manner of speaking, set the land apart for occupancy by elderly and low-income tribal members pursuant to a need recognized both by HUD and the Tribe. Moreover, the housing site is in close proximity to the settlement lands which are the center of tribal government, culture and religious life.

In addition, the housing site will be inhabited primarily by members of the Tribe. It is true that HUD regulations require that the housing be made available to any qualified individual, but they also permit that preferences be given to tribal members, many of whom already have applied.[4] Indeed, the project is viewed as a means of bringing the Narragansetts back together.

3. The Tribe argues that the housing site should be considered land implicitly held in trust by the United States because the deeds conveying it from the WHA to the Tribe require that it be placed in trust and an application for such status is pending. However, the regulations governing Indian affairs provide that "no acquisition of land in trust status, including a transfer of land already held in trust or restricted status, shall be

valid unless the acquisition is approved by the Secretary." 25 C.F.R. § 151.3.

4. In *South Dakota* the Court found that the fact that a HUD financed housing project intended mainly for the benefit of Indians was required to accept non-Indians did not prevent the project from being considered a dependent Indian community. *South Dakota,* 665 F.2d at 842.

Finally, the fact that HUD is financing the project pursuant to a program specifically designed for the benefit of tribal Indians demonstrates a close relationship between the community and the federal government. That relationship is underscored by the evidence that many of the occupants will participate in nutrition, education and job training programs subsidized by the federal government and administered by the Tribe on the adjacent settlement lands.

The State and Town advance several arguments as to why the housing site should not be considered part of Indian Country, none of which is persuasive. First, they assert that the housing site does not constitute a dependent Indian community because it currently has no inhabitants. No authority is cited to support that assertion and there does not appear to be any logical reason for reading such a requirement into the definition of a dependent Indian community. The facts that the land in question was acquired by the Tribe for the sole and specific purpose of providing housing for its members; that, upon completion, the project will be occupied almost entirely by Indians; and, that it is adjacent to the settlement lands are sufficient to establish the existence of an Indian community. To hold that dependent Indians actually must occupy such an area before it can be classified as an Indian community would be to ignore reality and to elevate form over substance.

■ The second argument advanced by the State and Town is that, because the Tribe purchased the housing site, the site is subject to state regulation to the same extent as if it had been purchased by any other entity. That argument, too, misapprehends the nature of a dependent Indian community. The manner in which title was acquired is not an important factor in determining whether land properly is classified as Indian Country. Thus, land set aside for a Tribe that ceases to be Indian Country when it is conveyed to a private party may once again become Indian Country when it is reacquired and held in trust for a Tribe. *See United States v. South Dakota,* 665 F.2d at 839. The relevant considerations are whether the area is "both Indian in character and federal-ly dependent". *Levesque,* 681 F.2d at 77. As the Court stated in *Mound:*

> [T]he "determination of whether lands are considered 'Indian Country' does not turn on the label used in designating them … nor on the manner in which the lands in question were acquired … Rather the test is whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples."

*United States v. Mound,* 477 F.Supp. at 158 (*quoting Youngbear v. Brewer,* 415 F.Supp. 807 (N.D.Iowa 1976), *aff'd* 549 F.2d 74 (8th Cir.1977)).

The final argument made by the State and Town is that classifying the Housing Site as part of Indian Country would permit the Tribe to "market" its exemption from state regulation. It is true that the classification of land as Indian Country cannot be used as a subterfuge that would allow non-Indians to evade state regulation by conducting their activities there. *See e.g., Washington v. Confederated Tribes of Colville Reservation,* 447 U.S. 134, 155, 100 S.Ct. 2069, 2082, 65 L.Ed.2d 10 (1980). Similarly, the fact that land purchased by a tribe is denominated as Indian Country because it is a dependent Indian community does not give that tribe carte blanche to engage in activities free from state regulation when those activities are unrelated to that status.

However, in this case, there is no suggestion that the housing site will be used for any purpose other than providing housing to elderly and low-income members of the Tribe pursuant to a federally financed and supervised program. If, in the future, the Tribe should cease using the property for that purpose, its status as Indian Country very well might be terminated:

> All Indian Country may ultimately lose that status … The important consideration is what the land in question is now, not what it may become in the future.

*United States v. South Dakota,* 665 F.2d at 842.

## II. *Applicability of State Law in Indian Country*

■ The fact that activity is conducted within Indian country does not necessarily

preclude state regulation of that activity. The Supreme Court has said that "even on reservations, state laws may be applied unless such application would interfere with Reservation self-government or would impair a right granted or reserved by Federal law". *Mescalero Apache Tribe v. Jones*, 411 U.S. at 148, 93 S.Ct. at 1270.

■ The process of determining the extent to which state law applies in Indian country is essentially one of "accommodation between the interests of the Tribes and the Federal Government on the one hand, and those of the State, on the other." *Rice v. Rehner*, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983) (quoting *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. at 156, 100 S.Ct. at 2082). In making that accommodation, state authority is limited both by the doctrine of tribal sovereignty and by any exercise of Congress's broad plenary power to regulate tribal affairs, which may preempt state jurisdiction. *White Mountain Apache*, 448 U.S. at 141–43, 100 S.Ct. at 2582–83; *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d at 705; *Ahboah*, 660 P.2d at 628–29.

## A. *Tribal Sovereignty*

■ The subject of tribal sovereignty is one on which a page of history is equivalent to a volume of logic. The doctrine is rooted in the recognition of Indian tribes as distinct political communities and in the historical policy of leaving them free to govern their own affairs within their territorial boundaries without state interference. *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 168, 93 S.Ct. 1257, 1260, 36 L.Ed.2d 129 (1973).

■ However, tribal sovereignty is not unqualified. It derives from the fact that tribes are "regarded as having a semi-independent position when they preserved their tribal relations; not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people with the power of regulating their internal and social relations." *Id.* at 173, 93 S.Ct. at 1262. Since tribes are not completely autonomous, tribal sovereignty is subject to limitations imposed by Congress pursuant to the authority vested in it by the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3. Thus, tribal sovereignty "exists only at the sufferance of Congress and is subject to complete defeasance". *Rice v. Rehner*, 463 U.S. at 719, 103 S.Ct. at 3295 (quoting *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978)).

■ The interplay between tribal sovereignty and *state* authority is much more complex. Tribal sovereignty is not subordinate to state authority. *Id.* However, as already noted, tribal sovereignty does not necessarily preclude the exercise of state authority in Indian country. With the passage of time, the law regarding the contours of tribal sovereignty, as expressed by the Supreme Court, has undergone considerable evolution from the notion that state law has no application in Indian country to the notion that historical conceptions of tribal sovereignty must be adjusted to take into account legitimate state interests. *McClanahan*, 411 U.S. at 171, 93 S.Ct. at 1261.

In *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 561, 8 L.Ed. 483 (1832) it was held that because of tribal sovereignty, state law "can have no force" on an Indian reservation. Thus, in effect, tribal sovereignty was viewed as an absolute bar to state jurisdiction. That principle was modified by a series of decisions culminating with *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), which viewed tribal sovereignty as an absolute bar to state jurisdiction only where "the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Id.* at 219–20, 79 S.Ct. at 270. Consequently, the governing rule became that "even on reservations, State laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law." *Mescalero Apache Tribe v. Jones*, 411 U.S. at 148, 93 S.Ct. at 1270 (citing *Organized Village of Kake v. Egan*, 369 U.S. 60, 75, 82 S.Ct. 562, 568–569, 7 L.Ed.2d 573 (1962)).

*McClanahan* ushered in a new era of preemption analysis in which state interests are taken into account. *McClanahan*, 411 U.S.

at 172, 93 S.Ct. at 1262; *Rice v. Rehner,* 463 U.S. at 718, 103 S.Ct. at 3295. It marked a shift in direction "from the idea of inherent Indian sovereignty as a bar to State jurisdiction and toward reliance on federal pre-emption ... [in which] the modern cases ... tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of State power." *McClanahan,* 411 U.S. at 172, 93 S.Ct. at 1262 (citations omitted).

### B. *Federal Pre-emption*

██  Pre-emption analysis is based on recognition of Congress's exclusive authority to regulate Indian affairs under the Indian Commerce and Supremacy Clauses. U.S. Const. art. I, § 8, cl. 3, U.S. Const. art. VI, cl. 2. Under preemption analysis "[s]tate jurisdiction is pre-empted by the operation of Federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the State interests at stake are sufficient to justify the assertion of State authority." *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 334, 103 S.Ct. 2378, 2386, 76 L.Ed.2d 611 (1983) (cited with approval in *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 216, 107 S.Ct. 1083, 1091, 94 L.Ed.2d 244 (1987)).

Consequently, tribal sovereignty is no longer an absolute bar to the assertion of state authority in Indian country. However, it retains significance as the prism through which federal law must be viewed. In the words of the Supreme Court, ... "[t]he Indian sovereignty doctrine is relevant ... not because it provides a definitive resolution of the issues ... but because it provides a backdrop against which the applicable treaties and Federal statutes must be read." *McClanahan,* 411 U.S. at 172, 93 S.Ct. at 1262; *Sac and Fox,* —— U.S. at ——, 113 S.Ct. at 1992.

██  That backdrop creates a reluctance "to infer that Congress has authorized the assertion of state authority." *Rice v. Rehner,* 463 U.S. at 719, 103 S.Ct. at 3295. In addition, to the extent that matters of internal self-government are implicated, tribal sovereignty is an important factor to be taken into account in balancing the competing interests that are the subject of pre-emption analysis. *See,* W. Canby, *American Indian Law,* at 76 (2d ed. 1988).

██  Because the pertinent federal statutes must be read against a backdrop of tribal sovereignty, the relevant pre-emption principles differ from those applicable in other contexts. *Rice v. Rehner,* 463 U.S. at 718, 103 S.Ct. at 3295; *New Mexico v. Mescalero,* 462 U.S. at 334, 103 S.Ct. at 2386. Congressional intent to pre-empt state law is not the "sole touchstone." *New Mexico v. Mescalero,* 462 U.S. at 334, 103 S.Ct. at 2386. Rather, the focus is on an analysis "that is informed by historical notions of tribal sovereignty." *Rice v. Rehner,* 463 U.S. at 718, 103 S.Ct. at 3295. Moreover, the nature of the backdrop may vary with the particular circumstances presented. There is no "single notion" of sovereignty that directs pre-emption analysis. *Id.* at 725, 103 S.Ct. at 3299.

██  Accordingly, pre-emption analysis is highly fact specific. It requires "a particularized inquiry into the nature of the state, federal and tribal interests at stake, ... to determine whether, in the specific context, the exercise of state authority would violate federal law." *White Mountain Apache Tribe v. Bracker,* 448 U.S. at 145, 100 S.Ct. at 2584 (citations omitted). Absent any express provision by Congress, the ultimate determinations to be made are whether "the Federal regulatory scheme is so pervasive as to preclude the additional burdens sought to be imposed;" whether state regulation would obstruct federal policies and whether the State performs any service or regulatory function that would justify the regulation. *Id.* at 148–49, 100 S.Ct. at 2586.

██  Generalizations in this area are dangerous because the cases indicate that such determinations are influenced by a variety of factors including the type of activity sought to be regulated, *compare, e.g., McClanahan,* 411 U.S. 164, 93 S.Ct. 1257 (state may not tax income earned by Indian on reservation) *with, Rice v. Rehner,* 463 U.S. 713, 103 S.Ct. 3291 (state may regulate liquor sales on reservation); whether those engaging in the activity are Indians or non-Indians, *compare,*

*e.g., Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069 (state may tax cigarette sales to non-tribal members) *with Dept. of Taxation and Finance v. Milhelm Attea & Bros., Inc.,* —— U.S. ——, 114 S.Ct. 2028, 129 L.Ed.2d 52 (1994) (noting that state has no authority to tax cigarettes sold to Indians for their own consumption); the purpose for which jurisdiction is being asserted, *see, e.g., Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) and *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (both making distinction between civil adjudicatory and civil regulatory jurisdiction); the nature of the state's interest, *compare, e.g., White Mountain Apache Tribe v. Bracker,* 448 U.S. at 150, 100 S.Ct. at 2587 (state's general desire to raise revenue an insufficient interest to justify state taxation) *with Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 184, 109 S.Ct. 1698, 1711, 104 L.Ed.2d 209 (1989) (federal law does not preempt New Mexico's oil and gas severance tax when, *inter alia* state provides valuable services); and last, but not least, the existence of statutes or treaties having specific application to some aspect of the matter.

Nevertheless, it is safe to say that the Supreme Court has been more inclined to uphold state regulatory authority in Indian country when the activity in question involves *non-*Indians than when it involves only Indians. Thus, in *New Mexico v. Mescalero* the Court stated that "under *certain* circumstances a State may validly assert authority over the activities of nonmembers on a reservation and ... in *exceptional* circumstances, a State may assert jurisdiction over the on-reservation activities of Tribal members." *New Mexico v. Mescalero Apache Tribe,* 462 U.S. at 331–32, 103 S.Ct. at 2384–85 (emphasis added); *see, Rice v. Rehner,* 463 U.S. at 723, 103 S.Ct. at 3298 (observing that *Congress* usually acts on the assumption that states have no power to regulate affairs of Indians on a reservation).

That is particularly true when the regulation deals with matters traditionally recognized as being exclusively within the realm of internal self-government. In those cases, the backdrop of sovereignty gives rise to a presumption of pre-emption that "derives from the rule against construing legislation to repeal by implication some aspect of tribal self-government." *Rice v. Rehner,* 463 U.S. at 726, 103 S.Ct. at 3299. Thus, in tax cases, which appear to be *sui generis,* the Supreme Court has explicitly recognized a presumption against state authority to tax Indians living in Indian country, which presumption can be overcome only by an express provision by Congress. *Sac and Fox,* —— U.S. at ——, 113 S.Ct. at 1992. On the other hand, the Court has held that no such presumption is warranted with respect to the regulation of liquor sales by Indians on a reservation because there is no tradition of tribal self-government in that area. *Rice v. Rehner,* 463 U.S. at 720, 103 S.Ct. at 3296 (when state regulation deals with a matter outside the scope of traditional tribal self-government, preemption analysis accords less weight to the backdrop of tribal sovereignty).

Unfortunately, the line between those matters that are exclusively within the province of tribal self-government and those matters that are not is often a hazy one. The location of the line in any given case depends on both the subject of the proposed regulation and on whether the regulation directly impacts a matter at the heart of self-government or has only an indirect impact on a peripheral aspect of self-government.

The presumption of pre-emption most commonly is applied in cases where states seek to regulate the activity of Indians in Indian Country. The rationale is that "when on-reservation conduct involving only Indians is at issue, state law is generally inapplicable for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." *White Mountain v. Bracker,* 448 U.S. at 144, 100 S.Ct. at 2584 (citations omitted). Consequently, the presumption is weakened considerably where such activity involves the likelihood of effects outside of Indian country that significantly impact important state interests. *New Mexico v. Mescalero,* 462 U.S. at 336, 103 S.Ct. at 2387 ("A State's regulatory interest will be particularly substantial if the State can point

to off-reservation effects that necessitate State intervention."); *Rice v. Rehner*, 463 U.S. at 724, 103 S.Ct. at 3298 (recognizing a strong state interest in regulating liquor sales on reservation because of possibility of off-reservation effects); *Puyallup Tribe, Inc. v. Dept. of Game*, 433 U.S. 165, 173–177, 97 S.Ct. 2616, 2621–23, 53 L.Ed.2d 667 (1977) (where Indians' right to fish is shared in common with all citizens, a state has a sufficient interest to permit it to regulate fishing by Indians and non-Indians on a reservation in order to conserve an important and shared natural resource).

### C. *Application of Pre-emption Analysis*

In this case, the issue is whether the kind of state regulation being asserted would interfere with federal or tribal interests reflected in the applicable federal statutes when they are read against the backdrop of Indian sovereignty and, if so, whether the state interests served are sufficiently compelling to justify the exercise of state authority. The regulations in question are those dealing with historic preservation, building and zoning requirements, ISDS, and protection of coastal resources.

### 1. *Historic and Archaeological Preservation*

In this case, there is no need to determine whether state regulations designed to preserve property having historical and/or archaeological significance apply to the Tribe's housing complex. Such regulations are implemented by the Rhode Island Historical Preservation Commission. Here, one of the Commission's archaeologists examined the site and determined that the proposed excavation would not damage anything of historical or archaeological significance. Based on that finding, the Commission has notified the Tribe that it has no objection to continuation of the project as long as it is conducted according to plan.

### 2. *Building Code and Zoning Ordinances*

Providing adequate housing for low income and elderly tribal members on tribal land is a matter in which both the Tribe and the Federal Government have a strong interest. It has been cited as one of the indicia of tribal self-government. *Rhode Island v. Narragansett Tribe*, 19 F.3d at 703. In this case, the federal interest is underscored by the fact that HUD has provided the necessary financing pursuant to a program specifically designed to assist tribal Indians.

Clearly, the Tribe's interest extends to the manner in which the housing is designed and constructed. HUD recognized that interest by directing the architect designing the project to "create a housing project, a community, which is spiritually and culturally satisfying to the needs of the Narragansett Tribe in particular as an eastern woodland tribe." As a result, the buildings utilize cluster arrangements, which mimic traditional Narragansett housing in form and density. Since the units will be occupied primarily by tribal members, the Tribe also has a strong interest in insuring that they will be constructed properly. To that end, the Tribe has adopted a building code that is satisfactory to HUD. Furthermore, the project architect testified that the proposed structures meet national building codes and would satisfy the Rhode Island building code as well.

Comparatively speaking the State's interest in the design and construction of the units is much weaker. As already noted, the structures will be located entirely in Indian Country and will be occupied primarily, if not exclusively, by Indians. Of course, the State still retains an interest in insuring that the units are safe for occupants, whether they be Indians or non-Indians. However, that interest is attenuated by the fact that the units must be constructed in accordance with standards acceptable to HUD and that they meet the requirements of national building codes. Consequently, the State's interest in applying its building code to the project does not weigh very heavily on the pre-emption scale.

The same may be said with respect to the Town's zoning ordinance. It is subject to the same analysis as state regulations because the Town is a creature of the State and the powers that it exercises are merely those delegated to it by the State. *State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d at 697. The most signifi-

cant factor in the analysis is that the zoning ordinance conflicts with the density requirements set forth in the HUD regulations. The zoning ordinance requires a minimum of two acres of land for each residence. HUD regulations, on the other hand, prohibit individual home sites that exceed one acre. 24 C.F.R. § 905.230. Presumably, the purpose of the HUD regulation is to insure that funds intended to provide housing are not unnecessarily diverted to land acquisition. The Charlestown Zoning Ordinance interferes with accomplishment of that purpose. *See New Mexico v. Mescalero*, 462 U.S. at 336, 103 S.Ct. at 2387 (when an Indian Tribe undertakes an enterprise under the authority of federal law, the assertion of state authority must be viewed in the light of any interference with the accomplishment of a federal purpose). Moreover, to the extent the Ordinance may be designed to prevent the effluent produced by ISDS systems from polluting groundwater, its goal is served by, and more appropriately addressed by, regulations specifically dealing with that subject.

In short, the provision of housing to low income and elderly tribal members is a matter that implicates federal interests and the Tribe's interest in internal self-government. Furthermore, those portions of the Charlestown Zoning Ordinance at issue in this case interfere with the accomplishment of a federal purpose. Since, in this case, the State has failed to demonstrate an interest in applying its regulations that is sufficiently compelling to justify intruding on federal and tribal interests, the State's building and zoning regulations are pre-empted.

### 3. *Clean Water Act and Safe Drinking Water Act*

■ One of the principal purposes of both the Clean Water Act (CWA) and Safe Drinking Water Act (SDWA) is to protect water supplies from contamination by pollutants. One source of pollutants is effluent from ISDS systems that is disposed of by injection into the soil. *See* 33 U.S.C. § 1251; *Natural Resources Defense Council v. United States Environmental Protection Agency*, 824 F.2d 1258, 1281 (1st Cir.1987) (explaining purpose of part C of the Safe Drinking Wa-

ter Act). Both statutes permit states to implement that objective by adopting and enforcing regulations that meet Environmental Protection Agency (EPA) requirements. 33 U.S.C. § 1370; 42 U.S.C. 300h-1. Rhode Island is one of the states that has promulgated such regulations and it is those regulations that are at issue in this case.

In determining the applicability of Rhode Island's regulations to the Tribe's housing project, one need look no further than the statutes they implement. The CWA expressly provides that Indian tribes may be treated as states if the Environmental Protection Agency (EPA) finds that they meet specified criteria. 33 U.S.C. § 1377. The First Circuit has stated that the Narragansett Tribe has met those requirements and is considered a state for purposes of the CWA. *Rhode Island v. Narragansett Tribe*, 19 F.3d at 703 (1st Cir.1994).

Similarly, the 1986 amendments to the SDWA authorize EPA to treat Indian tribes as states for purposes of that statute. 42 U.S.C. § 300h-1(e); *Phillips Petroleum Co. v. U.S. Environmental Protection Agency*, 803 F.2d 545, 548 (10th Cir.1986). Although the record is silent as to whether the Narragansett Tribe has received such approval, the SDWA regulations state that underground injection control programs for Indian lands in Rhode Island is administered by the EPA. 40 C.F.R. § 147.2001. Thus whether the State purports to regulate under authority of the SDWA or the CWA, its jurisdiction to do so is pre-empted by federal law.

### 4. *Coastal Zone Management Act*

■ The purpose of the Coastal Zone Management Act (CZMA) is to protect the sensitive resources of the nation's coastal zones. 16 U.S.C. § 1452. To achieve that purpose, the act permits individual states to adopt coastal zone management plans which, when approved by the federal government, may be enforced by the states. 16 U.S.C. §§ 1451 *et seq.*

■ Rhode Island's CRMP is such a plan. Among other things, the CRMP requires that anyone engaging in construction activity within the State's coastal zone or

engaging in construction activity that may affect natural resources within the coastal zone, must first, obtain state approval.

As previously stated, the housing site is located within Rhode Island's coastal zone and there is a real possibility that construction of the proposed project will affect Ninigret Pond, an important natural resource within the zone. Nevertheless, the Tribe has not sought CRMP approval and there is no indication that it even has made an assessment regarding the project's impact on coastal resources.

Like the state regulations promulgated pursuant to the CWA and SDWA, Rhode Island's CRMP serves rather than conflicts with federal interests. Congress has sought to accomplish the federal purpose by delegating to the State authority to promulgate and enforce regulations designed to protect coastal resources.

However, unlike the CWA and SDWA, the CZMA does not provide any alternate means for achieving that goal. Under the CWA and SDWA, EPA has promulgated regulations and enforces them in situations where satisfactory state regulation is lacking. *See, e.g.,* 40 C.F.R. 144.1 *et seq.* (regulations for underground injection control); 40 C.F.R. 131.22 (EPA promulgation of water quality standards). Moreover, as already noted, the CWA and SDWA permit Indian tribes to assume the roles of states for purposes of accomplishing the statutory objectives. In contrast, there is no federal agency that actively regulates activity affecting coastal resources. Enforcement of federal policy is left entirely to the states pursuant to federally approved programs. Nor does the CZMA contain any provision permitting Indian tribes to function as states for that purpose.

Moreover, there is no indication in the CZMA that Indian tribes are, or should be, exempt from its requirements. The regulations promulgated by the Secretary of Commerce contain a cryptic and indecipherable reference to the relationship between state programs and Indian lands:

Tribal participation in coastal management efforts may be supported and encouraged through a State's program provided that:

(1) Tribal lands are not held in trust by the Federal Government or otherwise excluded from the coastal zone and

2) such efforts are compatible with a State's coastal management policies and are in furtherance of the national policies of section 303 of the Act.

15 C.F.R. § 923.33. However, that reference falls far short of exempting tribal lands from the requirements of the CZMA or the management programs implementing it. No such exemption is contained in Rhode Island's federally approved CRMP, either. On the contrary, the CRMP includes within Rhode Island's coastal zone the entire Town of Charlestown, where the housing site is located.

In addition, the CZMA makes it clear that even federal agencies are subject to state plans. Thus, section 1456(c) states:

(1)(A) Each Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs. A Federal agency activity shall be subject to this paragraph unless it is subject to paragraph (2) or (3).

(B) . . .

(C) Each Federal agency carrying out an activity subject to paragraph (1) shall provide a consistency determination to the relevant State agency designated under section 306(d)(6) at the earliest practicable time, but in no case later than 90 days before final approval of the Federal activity unless both the Federal agency and the State agency agree to a different schedule.

(2) Any Federal agency which shall undertake any development project in the coastal zone of a state shall insure that the project is, to the maximum extent practicable, consistent with the enforceable policies of approved state management programs.

16 U.S.C. § 1456(c); see, *New England Naturist Association, Inc. v. Larsen,* 692 F.Supp. 75, 80–81 (D.R.I.1988). Those requirements are mirrored in both federal regulations and the CRMP. 15 C.F.R.

§ 930.34(b); CRMP, Ch. 7, § C.5.1 (Ex. 25). Provision also is made for resolving any disagreements between a federal agency and a state by mediation. 15 C.F.R. §§ 930.41–930.44. Indeed, HUD's own regulations require compliance with the CZMA for all HUD projects to which the statute applies. 24 C.F.R. § 50.4.

The fact that federal agencies are subject to Rhode Island's CRMP makes it difficult to infer that. requiring the Tribe to comply would somehow interfere with a federal interest reflected in the CZMA. Any basis for such an inference is further eroded by the provisions of the Settlement Act which, while not specifically applicable to the housing site, forms part of the backdrop against which the applicable statutes in this case must be read. As already noted, in the Settlement Act, Congress expressly provided that Rhode Island law is applicable to the settlement lands. Although the housing site is not part of the settlement lands, it is considered Indian Country, in large part, because the two parcels are contiguous and part of the same community. Therefore, there is little reason to conclude that they should be treated differently. If anything, the fact that the settlement lands were specifically set aside for the Tribe and the housing site was not suggests that the housing site should be more subject to state regulation.

Moreover, exempting from CZMA requirements property that is the site of significant development activity would create an appreciable gap in the federal regulatory scheme. In short, it would be incongruous to infer that applying Rhode Island's CRMP to the housing site is incompatible with some Congressional objective.

With respect to the question of tribal sovereignty, it is difficult to discern any way in which the application of Rhode Island's CRMP would directly or meaningfully impact the Tribe's interest in internal self-government. There has been no showing that compliance with the CRMP requirements would significantly impair or preclude construction of the proposed housing. Indeed, the Tribe's steadfast refusal to even discuss its plans with the State make it impossible to determine whether, or to what extent, the proposed project might conflict with the CRMP. Furthermore, the Tribe has failed to identify any legitimate interest in constructing the housing in a way that damages sensitive coastal resources. Without some indication that exemption from the otherwise plain requirements of the CZMA is "necessary to protect tribal self-government or to control internal relations" no such exemption should be inferred. *See, Brendale Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 426, 109 S.Ct. 2994, 3005, 106 L.Ed.2d 343 (1989).

Finally, in this case, any presumption against extending state regulatory authority to the activities of Indians in Indian country is considerably weakened because of the real possibility that those activities may produce effects outside of Indian Country that significantly affect important State interests. As previously stated, the project is in the watershed of Ninigret Pond, a poorly flushed and ecologically fragile coastal estuary which is an important spawning area for commercially significant species of fish. The pond is particularly vulnerable because it already has been ecologically stressed by nitrates and other components of ISDS effluent, which have entered the groundwater of the watershed and threaten the pond with eutrophication. Given the fact that groundwater from the housing site will contain some nitrates and will migrate off site, there is an appreciable risk that Ninigret Pond will be affected adversely. It is true that the Tribe presented evidence from its project engineer that, according to his mathematical calculations, nitrate levels at the boundary line of the housing site would be below national drinking water standards. However, it appeared that he was unfamiliar with both Ninigret Pond and the ground water flow at the housing site. Further, he made no effort to explain what effect, if any, the level of nitrates he anticipated would have on the pond. More importantly, his calculations were based solely on the projected effluent from those units comprising the first phase of development. Specifically, he took into account only nineteen of the fifty units the Tribe proposes to build.

In any event, a realistic possibility of off-site effects that may significantly impact important state interests is all that is required for purposes of pre-emption analysis. The State need not conclusively prove that such harm is certain to occur. The purpose of the regulatory process is to permit a reasoned and informed determination as to what is required. When important interests are at stake and the possibility of significant harm is a real one, the state's interest in regulating is not defeated by the opinions of those subject to regulation that no harm is likely to occur. Such opinions, and the facts supporting them, should be presented, first, to the regulatory body and, if necessary, to the court reviewing that body's determination.

To summarize, application of Rhode Island's CRMP regulations will promote not interfere with federal interests as reflected in the CZMA. Moreover, compliance with those regulations will not directly infringe on the Tribe's right to self-government in any meaningful way. Finally, the State has demonstrated a compelling interest justifying the assertion of State authority. Therefore, Rhode Island's CRMP is not pre-empted by federal law and is applicable to the housing site.

■ Of course, that does not necessarily mean that strict compliance with every provision of the CRMP is required. The CRMP addresses a wide variety of concerns under the aegis of coastal zone protection. Many of those concerns overlap concerns that are the subject of specific regulation by other state agencies. With respect to some of those concerns, determining whether activity within the regulatory jurisdiction of another agency is consistent with the CRMP turns, almost entirely, on whether such activity meets the requirements of the other agency. For example, as already noted, in assessing the impact that a proposed project may have on historically significant property, the Coastal Resources Management Council, essentially, relies on determinations made by the Rhode Island Historic Preservation Commission in accordance with regulations promulgated by that body pursuant to federal law.

Consequently, when applying any given component of the CRMP to activity in Indian Country, principles of pre-emption analysis must be given some consideration. Thus, although approval of a construction project under CRMP requires issuance of a state building permit, that requirement may not be applicable where, as here, a determination has been made that the state's interest in mandating a permit is outweighed by federal and tribal interests. By the same token, the fact that the CRMP may contain density requirements similar to those set forth in the Charlestown Zoning Ordinance does not automatically require compliance. Such a requirement must be evaluated in light of the purpose it serves and the extent to which it conflicts with HUD regulations on the subject. That is precisely why the CZMA mandates that federal agencies submit consistency requirements and why federal regulations provide for mediation of disputes between federal agencies and states. Because no consistency determination has been made in this case, it is impossible to determine whether the proposed project conflicts with the CRMP and, if so, whether the portions of the plan at the root of any such conflict are applicable. Therefore, those questions must await future determination.

### D. The Town Easement

■ Resolution of the Town's request that the Tribe and the WHA be enjoined from infringing on the drainage easement serving the town road that traverses the housing site does not require protracted discussion. The WHA acquired the property by purchasing it from Gilbert and Blackwell, Inc., a private corporation. Consequently, the title the WHA received was subject to the established and recorded rights of others in that property. One of those rights was the drainage easement previously conveyed to the Town by Gilbert and Blackwell.

The WHA has cited no authority for the proposition that classification of the property as Indian Country extinguishes the town's property rights. On the contrary, it has been held that an Indian tribe lacks authority to either zone land owned by non-Indians or exclude the owners even when that land is

located in Indian Country. *Brendale*, 492 U.S. at 424, 428, 109 S.Ct. at 3004, 3006. Indeed, the notion that vested property rights could be abrogated in that manner is totally inconsistent with both the nature of such rights and established principles of property law.

### CONCLUSION

For all of the foregoing reasons, it is hereby ORDERED that:

1. The Wetuomuck Housing authority, the Narragansett Indian Tribe, their officers, members, agents and those acting in concert with them are permanently enjoined from:

    a. Occupying or permitting occupation of any buildings constructed or to be constructed on the housing site (i.e., Lot No. 119 on Charlestown Assessor's Plat No. 17 in the Town of Charlestown, Rhode Island) unless and until all applicable requirements of Rhode Island's Coastal Resources Management Program have been satisfied; and,

    b. Interfering with the drainage easement previously conveyed to the Town of Charlestown.

2. The request for a permanent injunction is denied insofar as it is based on the plaintiffs' failure to comply with the requirements of any State regulations promulgated pursuant the to Historic Preservation Act, the Clean Water Act, the Safe Drinking Water Act and those provisions of the Rhode Island building code and Charléstown Zoning Ordinance that are at issue in this case.

3. This Court shall retain jurisdiction for the purposes of enforcing and/or modifying the terms of the permanent injunction.

IT IS SO ORDERED.