ROTH v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:ROTH v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 ROTH v. STATE
2021 OK CR 27
Case Number: F-2017-702
Decided: 09/16/2021
RICHARD RAY ROTH, Appellant v. STATE OF OKLAHOMA, Appellee.
Cite as: 2021 OK CR 27, __ __

 

 

HUDSON, VICE PRESIDING JUDGE:

¶1 Appellant, Richard Ray Roth, was tried by jury and convicted of Count 1: First Degree Manslaughter, in violation of 21 O.S.2011, § 711; and Count 2: Leaving the Scene of a Fatality Accident, in violation of 47 O.S.2011, § 10-102.1, in Wagoner County District Court, Case No. CF-2013-592. The jury recommended a sentence of nineteen years imprisonment plus a $7,500.00 fine on Count 1 and one year imprisonment plus a $1,000.00 fine on Count 2. The Honorable Darrell Shepherd, District Judge, presided at trial and sentenced Roth in accordance with the jury's verdicts. The trial court ordered these sentences to run consecutively with credit for time served. Appellant must serve 85% of the sentence imposed on Count 1 before becoming eligible for parole. 21 O.S.Supp.2015, § 13.1. Appellant now appeals from these convictions and sentences.

¶2 The record in this case shows twelve-year-old Billy Jack Chuculate Lord died from injuries he sustained after being struck from behind by a Chevy Tahoe driven by Appellant. Lord was either riding or pushing his bicycle on a street in Wagoner at the time of the collision. Appellant drove away from the scene of the accident but later returned with his wife. Police at the scene detected a strong smell of alcohol on Appellant's breath and he admitted drinking two beers prior to the collision. Authorities drew blood from Appellant a short time later at a local hospital. Subsequent laboratory analysis of that blood sample revealed Appellant's BAC was 0.291 grams, well past the legal limit for driving.

* * * * *

¶3 In McGirt v. Oklahoma, 140 S. Ct. 2452 (2020), the Supreme Court held that the Creek Reservation in eastern Oklahoma was never disestablished by Congress and, thus, constitutes Indian Country for purposes of federal criminal jurisdiction. The parties in the present case have stipulated during remanded proceedings before the District Court that the victim was Indian and the crimes in this case occurred on the Creek Reservation. In today's decision, we uphold the District Court's adoption of these stipulations and address whether the State of Oklahoma has concurrent jurisdiction along with the United States to prosecute crimes committed on the Creek Reservation by non-Indian defendants against Indian victims. Based on the overwhelming weight of authority governing this issue, we conclude the State has no jurisdiction to prosecute the crimes charged here due to the victim's Indian status and the occurrence of the crimes in Indian Country. We therefore reverse and remand Appellant's convictions with instructions to dismiss.

I. Appellant's Jurisdictional Claim.

¶4 In Proposition One of his brief in chief on appeal, Appellant claims the District Court lacked jurisdiction to try him. Appellant argues the victim was a citizen of the Cherokee Nation and the crimes occurred within the boundaries of the Creek Reservation. Pursuant to McGirt, Appellant's claim raises as a threshold matter two separate questions: (a) the Indian status of the victim; and (b) whether the crimes occurred on the Creek Reservation. These issues required fact-finding. We therefore remanded this case to the District Court of Wagoner County for an evidentiary hearing.

¶5 We instructed the District Court to determine whether the victim had some Indian blood and was recognized as an Indian by a tribe or the federal government. The District Court was further ordered to determine whether the crimes in this case occurred in Indian Country. In so doing, the District Court was directed to consider any evidence the parties provided, including but not limited to treaties, statutes, maps, and/or testimony.

¶6 We also directed the District Court that in the event the parties agreed as to what the evidence would show with regard to the questions presented, the parties may enter into a written stipulation setting forth those facts upon which they agree and which answer the questions presented and provide the stipulation to the District Court. Finally, the District Court was ordered to file written findings of fact and conclusions of law with this Court.

II. The Remanded Proceedings.

¶7 A hearing was held in this case on October 19, 2020, before the Honorable Douglas Kirkley, District Judge. An order containing the District Court's findings of fact and conclusions of law from that hearing was timely filed with this Court along with a transcript of the hearing. The record shows the parties stipulated that the victim had 3/8th Cherokee blood and was a registered member of the Cherokee Nation Tribe at the time of his death; that the Cherokee Nation Tribe of Oklahoma is an Indian Tribal Entity recognized by the federal government; and that the charged crimes in this case occurred within the Creek Reservation. These written stipulations were signed by all counsel and were filed of record with the District Court.

¶8 In its written findings of fact and conclusions of law, the District Court accepted and found the facts as stipulated by the parties. On these facts, the District Court concluded that the victim was an Indian for purposes of federal law based on the percentage of Indian blood. The District Court further found the victim was recognized as an Indian either by the federal government or a tribe and that the Creek Reservation is Indian Country for purposes of federal law.

III. Post-Remand Supplemental Briefs.

¶9 Both Appellant and the State filed with this Court supplemental briefs after remand. In its brief, the State urges in light of the stipulations that it has concurrent jurisdiction with the federal government over the charged crimes in this case. Specifically, the State claims it has concurrent jurisdiction over all crimes committed by non-Indians against Indian victims in Indian Country. Alternatively, the State requests in its brief that should this Court find Appellant is entitled to relief based on the District Court's findings, this Court should stay any order reversing the convictions for thirty days so that the appropriate authorities can review his case, determine whether it is appropriate to file charges and take custody of Appellant. Cf. 22 O.S.2011, § 846.

¶10 In his brief, Appellant opposes the State's concurrent jurisdiction argument both procedurally and substantively. Appellant argues we have "no authority to consider" the State's concurrent jurisdiction argument because it goes beyond the scope of the remand order. Appellant complains the State should have raised the issue in its original response brief and not waited until now to raise it before the Court. Appellant further argues this claim substantively lacks merit. Appellant urges that the federal court has exclusive jurisdiction over Appellant's crimes because no federal statute authorizes state jurisdiction in this case.

IV. Analysis.

¶11 We find that under the law and evidence relief is warranted. The District Court's findings of fact and conclusions of law are fully supported by the stipulations jointly made by the parties at the remanded hearing. Appellant has thus met his burden of establishing the victim's status as an Indian, having 3/8th degree Cherokee blood and being a member of the Cherokee Nation Tribe. Appellant has also met his burden of proving that the crimes in this case occurred on the Creek Reservation and, thus, occurred in Indian Country for purposes of federal law. See 18 U.S.C. § 1151; McGirt, supra.

¶12 The State of Oklahoma does not have jurisdiction to prosecute Appellant in this matter.[1] We herein reject the State's concurrent jurisdiction argument.[2] Federal law broadly preempts state criminal jurisdiction over crimes committed by, or against, Indians in Indian Country. 18 U.S.C. §§ 1151-1153. Title 18 U.S.C. § 1152, the Indian Country Crimes Act, specifically governs Appellant's case. Under Section 1152, the United States has jurisdiction in Indian Country over crimes that non-Indians commit against Indians. McGirt, 140 S. Ct. at 2479; Williams v. United States, 327 U.S. 711, 714 & n.10 (1946). Section 1152 "extends the general criminal laws of federal maritime and enclave jurisdiction to Indian country, except for those offenses committed by one Indian against the person or property of another Indian." Negonsott v. Samuels, 507 U.S. 99, 102 (1993) (internal quotation omitted).

¶13 Congress's authority to regulate Indian affairs in this manner is well-established and remains exclusive. See, e.g., McGirt, 140 S. Ct. at 2463 ("The policy of leaving Indians free from state jurisdiction and control is deeply rooted in this Nation's history." (internal quotation marks omitted)); United States v. Lara, 541 U.S. 193, 200 (2004) ("[T]he Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as 'plenary and exclusive.'" (quoting Washington v. Confederated Bands and Tribes of Yakima Nation, 439 U.S. 463, 470-71 (1979) and Negonsott, 507 U.S. at 103)); Worchester v. Georgia, 31 U.S. 515, 519 (1832) ("The treaties and laws of the United States contemplate the Indian territory as completely separated from that of the states; and provide that all intercourse with them shall be carried on exclusively by the government of the union."); id. at 561 ("The whole intercourse between the United States and [the Tribe] is, by our constitution and law, vested in the government of the United States."). Under federal law, jurisdiction over Appellant's killing of the victim, a Cherokee Indian, on the Creek Reservation lies exclusively with the federal government. See, e.g., McGirt, 140 S. Ct. at 2479 (holding that "States are otherwise free to apply their criminal laws in cases of non-Indian victims and defendants, including within Indian country" whereas federal law--including Section 1152--governs crimes involving Indian victims and defendants in Indian country); Confederated Bands and Tribes of Yakima Nation, 439 U.S. at 470-71 ("[C]riminal offenses by or against Indians have been subject only to federal or tribal laws . . . except where Congress in the exercise of its plenary and exclusive power over Indian affairs has expressly provided that State laws shall apply." (internal quotation and citations omitted)); Williams v. Lee, 358 U.S. 217, 220 (1959) ("[S]tate courts have been allowed to try non-Indians who committed crimes against each other on a reservation. But if the crime was by or against an Indian, tribal jurisdiction or that expressly conferred on other courts by Congress has remained exclusive." (footnotes and citations omitted)); Williams, 327 U.S. at 714 & n.10 (and cases cited therein) (stating that federal courts, rather than Arizona state courts, have jurisdiction over a statutory rape offense committed on the Colorado Indian River Reservation by a non-Indian against an Indian victim).

¶14 Congress has authorized States to assume criminal jurisdiction over Indian Country in limited circumstances. The State of Oklahoma, however, has never asserted its right under federal law to assume jurisdiction over any portion of Indian Country within its borders. McGirt, 140 S. Ct. at 2478. McGirt specifically held that federal law applied in Oklahoma "according to its usual terms" because the State had never complied with the requirements to assume jurisdiction over the Creek Reservation and Congress had never expressly conferred jurisdiction on Oklahoma. Id.

¶15 Pursuant to McGirt, the State therefore has no jurisdiction over the crimes committed in this case.[3] We cannot ignore, or attempt to bypass, any aspect of McGirt based on the State's simple assertion of concurrent jurisdiction. It is the Supreme Court's "prerogative alone to overrule one of its precedents[,]" Bosse v. Oklahoma, 137 S. Ct. 1, 2 (2016), not ours. Adoption of the State's theory of concurrent jurisdiction is a political matter that may be addressed by Congress, not this Court. See Negonsott, 507 U.S. at 103; United States v. John, 437 U.S. 634, 652-54 (1978). We have no choice but to dismiss this case for lack of jurisdiction under the Supremacy Clause, see Article VI, Clause 2 of the United States Constitution and Article 1, § 1 of the Oklahoma Constitution.

* * * * *

¶16 We recognize that today's ruling results in much hardship for the victim's family. That much is apparent from the victim impact statement presented by the victim's mother, Pamela Sequichie-Chuculate, to the District Court on remand.[4] We briefly consider that statement here given the nature of today's ruling. In the victim impact statement, Ms. Sequichie-Chuculate expressed her bewilderment that Appellant, a non-Indian, could "benefit" in this way from her son's status as an Indian. The victim's mother noted that her son was a citizen of the United States and of the state of Oklahoma in addition to being a tribal member. In the aftermath of McGirt, the victim's mother expressed that "I don't feel like I belong to [a] people, anymore. I don't feel like I belong to a nation, anymore. I don't feel like I belong to a country anymore. I just don't know where to go with this from here." After discussing the fear her surviving children have of Appellant, Ms. Sequichie-Chuculate asked "which one of you guys are going to come to my house and sit my kids down and tell them, 'look, this is why' and hold my babies hands and bring them some kind of peace and comfort."

¶17 Ms. Sequichie-Chuculate's outrage is understandable. The record shows there is a serious question whether this case will be prosecuted in federal court. The District Attorney raised below the possibility that the statute of limitations governing these crimes in federal court has long since passed.[5] We reference the prosecutor's statement and the victim impact testimony only to acknowledge the exceptionally hard impact today's decision will have on the victim's surviving family and friends, not to mention the community where these crimes occurred, regardless of what happens after today's decision. Despite this, we have no choice but to apply the governing federal law. The matter is simply out of our hands after McGirt.[6]

* * * * *

¶18 Based upon the foregoing, we find the State of Oklahoma did not have jurisdiction to prosecute Appellant in this matter. The Judgment and Sentence in this case is hereby reversed and the case remanded to the District Court of Wagoner County with instructions to dismiss the case. This resolution renders moot the other seven propositions of error raised in Appellant's brief in chief.

DECISION

¶19 The Judgment and Sentence of the District Court is REVERSED AND REMANDED WITH INSTRUCTIONS TO DISMISS. The MANDATE is not to be issued until twenty days from the delivery and filing of this decision.[7]

 

AN APPEAL FROM 
THE DISTRICT COURT OF WAGONER COUNTY
THE HONORABLE DOUGLAS KIRKLEY, DISTRICT JUDGE 

 

 
 
 
 APPEARANCES ON REMAND

 KATRINA CONRAD-LEGLER
 OKLA. INDIGENT DEFENSE
 SYSTEM
 P.O. BOX 926
 NORMAN, OK 73070
 COUNSEL FOR DEFENDANT

 JACK THORP
 DISTRICT ATTORNEY
 WAGONER COUNTY
 307 EAST CHEROKEE
 WAGONER, OK 74467
 COUNSEL FOR THE STATE

  

 
 MIKE HUNTER
 OKLA. ATTORNEY GENERAL
 ASHLEY L. WILLIS
 ASST. ATTY. GENERAL
 313 N.E. 21st STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR THE STATE
 
 
 APPEARANCES ON APPEAL

 KATRINA CONRAD-LEGLER
 OKLA. INDIGENT DEFENSE
 SYSTEM
 P.O. BOX 926
 NORMAN, OK 73070
 COUNSEL FOR APPELLANT

 DAWN CASH, ACTING
 OKLA. ATTORNEY GENERAL
 ASHLEY L. WILLIS
 CAROLINE E.J. HUNT
 JENNIFER CRABB
 ASST. ATTYS. GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR APPELLEE

 SARA HILL
 CHEROKEE NATION
 ATTORNEY GENERAL
 P.O. BOX 948
 TAHLEQUAH, OK 74465
 COUNSEL FOR AMICUS
 CURIAE

 ROGER WILEY
 MUSCOGEE NATION
 ATTORNEY GENERAL
 P.O. BOX 580
 OKMULGEE, OK 74447
 COUNSEL FOR AMICUS
 CURIAE
 
 
  
 
 
 

 

OPINION BY: HUDSON, V.P.J. 
ROWLAND, P.J.: DISSENT 
LUMPKIN, J.: CONCUR IN RESULTS 
LEWIS, J.: SPECIALLY CONCUR

FOOTNOTES

[1] The State preserved its concurrent jurisdiction argument by referencing it during the remanded hearing in District Court.

[2] This Court first rejected the State's concurrent jurisdiction argument in Bosse v. State, 2021 OK CR 3, ¶¶ 23-28, 484 P.3d 286, 294-95, and Ryder v. State, 2021 OK CR 11, ¶¶ 13-28, 489 P.3d 528. However, we recently overruled Bosse and Ryder on other grounds in State ex rel. Matloff v. Wallace, 2021 OK CR 21, __P.3d__ (holding that McGirt and our post-McGirt reservation rulings shall not apply retroactively to void a final state conviction). Based on Matloff, we vacated the previous orders and judgments granting post-conviction relief, and withdrew the accompanying opinions, in Bosse and Ryder. See Ryder v. State, 2021 OK CR 25, __P.3d__; Bosse v. State, 2021 OK CR 23, __P.3d__. Matloff has no applicability to the present case because this is a direct appeal. However, our full analysis of the concurrent jurisdiction issue in this case is now controlling authority on this issue in Oklahoma and should be relied upon exclusively by the bench, bar and public from this date forward.

[3] The Dissent argues that state criminal jurisdiction is not preempted because there is evidence in the record showing that federal jurisdiction is absent due to the expiration of the statute of limitations for federal prosecution of Appellant's crimes. We ordered supplemental briefing by the parties on this issue and also received a joint amicus brief from the Cherokee Nation and Muscogee (Creek) Nation tribes. Neither the State, Appellant, nor the Tribes voice any support for the Dissent's theory. For its part, the State portrays its theory of concurrent jurisdiction as the only way state courts may assert jurisdiction in this case. We find the Dissent's jurisdictional approach is foreclosed for largely the same reasons as the State's concurrent jurisdiction theory. The Supreme Court's holdings dictate that Congress has plenary and exclusive authority under the Constitution to regulate Indian affairs and the various treaties made by the federal government with the Creek Tribe, along with other governing federal law (including 18 U.S.C. §§ 1152-53), simply do not countenance state prosecution of crimes on the Creek Reservation involving Indian defendants or victims.

[4] Appellant objected below to the victim impact statement given in this case. Ms. Sequichie-Chuculate's victim impact statement, however, was authorized by the Oklahoma Constitution. See Okla. Const. art. 2, § 34(A),(C).

[5] While this Court believes the timely filing of the charges in state court tolled the running of any statute of limitations, that will be for the federal courts to determine.

[6] I maintain my previously expressed views on the significance of McGirt, its far-reaching impact on the criminal justice system in Oklahoma and the need for a practical solution by Congress. See, e.g., Hogner v. State, 2021 OK CR 4, __P.3d__ (Hudson, J., Specially Concurs).

[7] By withholding issuance of the mandate for twenty days, the State's request for time to determine further prosecution is rendered MOOT. The State's separate Request For Stay And Abatement of Appeal, tendered in its June 14, 2021, supplemental brief, is DENIED. However, this ruling is without prejudice to any future request by the State to stay the mandate in this case pending the timely filing and disposition of a petition for writ of certiorari in the United States Supreme Court.

 

 

ROWLAND, PRESIDING JUDGE, DISSENTING:

¶1 I must respectfully dissent to dismissing Roth's First Degree Manslaughter conviction which is based on the fact that he, a non-Indian, killed a young Indian child on Indian reservation land. Because the five-year statute of limitations on any federal offense has long since expired, this case cannot be retried in federal court and Roth will likely go free without further punishment and without so much as a traffic ticket on his record for the events in this case.

¶2 In my view, the Major Crimes Act (MCA) does not preempt the State of Oklahoma's criminal jurisdiction when there is no prosecutable federal crime due to the expiration of the federal statute of limitations, as is the case here. Three points support this conclusion. First, this Court cannot completely and properly apply the MCA when federal authority to prosecute is absent and this inoperability of the MCA leaves no authority preempting the State's inherent jurisdiction. Second, the underlying purposes of the MCA are frustrated and perverted by holding that state jurisdiction is preempted when no concomitant and preempting federal jurisdiction is present. Third, the majority's approach unnecessarily creates exactly the sort of jurisdictional gap this Court warned of in Goforth v. State, 1982 OK CR 48, 644 P.2d 114.

A.

A SUMMARY OF THE FACTS

¶3 In November of 2013, twelve-year-old Billy Jack Chuculate Lord and his older brother were riding their bicycles shortly after 10:00 p.m. in Wagoner, Oklahoma. The Appellant, Richard Ray Roth, struck Billy Jack from behind with his pickup truck, fled the scene and returned home, picked up his wife and then returned to the scene of the crime where others were attempting to save the child's life. Their efforts were fruitless and Billy Jack died on the roadside.

¶4 As Roth returned to the scene with his wife, a nurse, who happened to have passed by, was rendering aid, and only then was 911 called to dispatch emergency services. While speaking to officers, Roth admitted that he had been drinking, denied that he had been driving the pickup, claimed his wife was actually the truck's driver, and then retracted that last claim only when officers turned to Mrs. Roth and confronted her about whether she was in fact the driver. Roth claimed he had not immediately called 911 because his cell phone was home on the charger, but expert testimony and phone records at trial refuted his claim. He claimed the child had darted in front of his truck, but expert testimony at trial also refuted that claim. He claimed to have consumed only two beers, but while his blood was being drawn for analysis he threatened the medical technician with physical violence if she attempted to draw the blood. Ultimately his blood was drawn at the hospital, where officers smelled a strong odor of alcohol emanating from Roth. Analysis showed his blood alcohol content was .29, almost four times the legal limit for drunk driving.

B.

STATE JURISDICTION IS NOT AND
WAS NEVER PREEMPTED IN THIS CASE

¶5 When an Indian commits or is the victim of certain offenses in Indian Country, the MCA gives the federal government exclusive jurisdiction to prosecute. This law is preemptive of state criminal jurisdiction "when it applies....", United States v. John, 437 U.S. 634, 651 (1978) (emphasis added). If the MCA or, in the case of lesser crimes, the Indian Country Crimes Act (ICCA) do not apply, then the State of Oklahoma, as a sovereign with general police powers, has inherent authority to prosecute and punish crimes within its borders.

¶6 When properly raised and proved the MCA acts to preempt state jurisdiction with federal jurisdiction, but it is not self-executing; one claiming a lack of state jurisdiction in a particular case must make a prima facie showing that the defendant or the victim is an Indian and that the crime was committed in Indian Country. Parker v. State, 2021 OK CR 17, ¶ 32, __P.3d__; Goforth, 1982 OK CR 48, ¶¶ 6-9, 644 P.2d at 116-17. Failure to prove either of these factors results in the State of Oklahoma retaining jurisdiction over the prosecution. Goforth, 1982 OK CR 48, ¶ 7, 644 P.2d at 116. Where these two factors are established, the MCA preempts the State of Oklahoma's jurisdiction to prosecute the major crime, vesting exclusive jurisdiction in the federal government. The preemption of state prosecution with federal prosecution cannot be implemented here because of the expiration of the federal statute of limitations for manslaughter. Accordingly, at best, only one-half of the MCA's operations can be effectuated, namely taking jurisdiction from the State, since the uncontroverted evidence shows there is no longer a prosecutable federal crime.[1]

¶7 The majority leans heavily upon the unquestionable exclusive authority of Congress to regulate affairs with the tribes, surveying in a most erudite fashion cases granting "plenary and exclusive" power over the tribes. That is quite true, but it does not help with the issue before us. Congress, exercising that "plenary and exclusive" authority, has legislated the Major Crimes Act. Our task is not to interpret or rule upon Congress's clear authority to pass such laws, but rather to apply those laws, in this case the MCA, consistent with judicial logic. McGirt does not speak to this because McGirt is not a decision interpreting the MCA, as its focus was the geographical territory over which the MCA can be applied. This case presents an issue of first impression, but it is not whether Congress has more than two hundred years of historical authority to regulate matters with tribes. It is whether an act of Congress pursuant to that authority, which preempts what would otherwise be State jurisdiction, is applicable when the federal statute of limitations has erased any ability to hold the offender accountable in federal court.

¶8 The State, through the Attorney General, agrees with the majority as to the statute of limitations issue, noting that jurisdiction is determined at the time the crime is committed and that if federal authorities had jurisdiction at the time of the crime, the expiration of the statute of limitations would not change that. Without question, jurisdiction is determined at the time of the crime, but the preemption of state jurisdiction is a function and result of the Major Crimes Act, and only if one applies that Act retroactively can you find state jurisdiction preempted.[2] The majority and the Attorney General treat the preemption of state jurisdiction as a fixed and unchallengeable feature of history, something which happened at the time of the commission of the crime but was only recently revealed when Roth raised his claim and presented evidence of his victim's Indian status and the location of the crime in Indian Country. Were this viewpoint correct, even those whose convictions were final decades ago could erase them in post-conviction proceedings without running up against procedural bars. But, as we recently held, where a subsequent court ruling denies a sovereign of jurisdiction on an Indian reservation, those who were otherwise fairly prosecuted before that court decision are barred from raising the jurisdictional claim in a collateral attack once their appeals are final. State ex rel. Matloff v. Wallace, 2021 OK CR 21, __P.3d__. See also United States v. Cuch, 79 F.3d 987, 993 (10th Cir. 1996) (denying federal habeas review where subsequent Supreme Court decision held crime did not occur in Indian Country and thus there was no federal jurisdiction).

¶9 Even the McGirt majority opinion acknowledges that procedural defenses and legal doctrines such as laches might preclude federal preemption. "[B]ut, in seeking to defend the state-court judgment below, Oklahoma has put aside whatever procedural defenses it might have and asked us to confirm that the land once given to the Creeks is no longer a reservation today." McGirt v. Oklahoma, 140 S.Ct. 2452, 2460 (2020). Justice Gorsuch goes into more detail about these legal doctrines later in the opinion:

Many other legal doctrines--procedural bars, res judicata, statutes of repose, and laches, to name a few--are designed to protect those who have reasonably labored under a mistaken understanding of the law. And it is precisely because those doctrines exist that we are "fre[e] to say what we know to be true ... today, while leaving questions about ... reliance interest[s] for later proceedings crafted to account for them." Ramos, 590 U. S., at --------, 140 S.Ct., at 1047 (plurality opinion). (emphasis added)

Id. at 2481.

¶10 Thus, a fair reading of McGirt shows the Supreme Court anticipates courts will apply reasonable limitations on its ruling, including construction of the MCA's preemption rule, to achieve fair results. This is so because it is not the various treaties with the tribes, nor Congress's plenary power to regulate affairs with the tribes, which preempt state jurisdiction. To be sure, these authorities give Congress the power to preempt state jurisdiction through the MCA, but unless and until that statute and its preemption are operative, the State of Oklahoma has jurisdiction to prosecute crimes within its borders.

¶11 The Supreme Court has never held that the MCA divests a state of its criminal jurisdiction once the federal crime is no longer prosecutable, nor can I find any such decision by any of the federal circuits. Proceeding as we are in this case in the absence of such controlling authority is improvident and is akin to a child custody judge removing the children from one parent, but not placing them elsewhere. It makes no legal sense, it is commanded by no precedent, and it leaves violent crime victims in Indian Country without recourse to justice. The result is manifest injustice to the victim with no discernable advancement or protection of tribal sovereignty.

C.

APPLICATION OF THE MCA IN THIS CASE FRUSTRATES 
THE UNDERLYING PURPOSES OF THE ACT

¶12 One central purpose behind the MCA is to ensure that those who commit crimes in Indian Country are adequately punished. "Congress enacted the Major Crimes Act because Indian tribes, who had exclusive jurisdiction over crimes committed by Indians on Indian land, were not adequately punishing their people for major offenses such as murder." United States v. Norquay, 905 F.2d 1157, 1161 (8th Cir. 1990) (citing Keeble v. United States, 412 U.S. 205, 209--12 (1973)). This interest in criminal accountability is to be balanced with protecting the sovereignty interest of the various tribes. United States v. Begay, 42 F.3d 486, 498 (9th Cir. 1994). Neither of these purposes is advanced, and indeed both are frustrated, by an interpretation of the MCA which extinguishes any ability to prosecute and punish this crime. As the majority notes, the result in this case is a surviving mother who is "bewildered" that a law intended to protect Indians who are victims of violent crimes in Indian Country could leave her family feeling so abandoned and unprotected.

¶13 Another purpose behind the MCA was to fill jurisdictional gaps.

The IMCA, the first version of which was enacted in 1885 . . . has likewise been described as providing a gap-filling function, see United States v. Pluff, 253 F.3d 490, 494 (9th Cir. 2001), as amended (Aug. 6, 2001) ("There is no difference relevant to this case between the purpose of the ACA and that of the [I]MCA. Both statutes were enacted to fill jurisdictional gaps.").

United States v. Jones, 921 F.3d 932, 935 (10th Cir. 2019).

¶14 This Court and our Supreme Court have long interpreted the Indian Country jurisdictional provisions of our state constitution to avoid a jurisdictional void where crimes go unpunished. In Goforth, 1982 OK CR 48, ¶ 4, 644 P.2d at 115, the appellant asserted that the State lacked jurisdiction over his crimes because they occurred in Indian Country, relying in part upon Article I, Section 3 of the Oklahoma Constitution which provides:

The people inhabiting the State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States.

Okla. Const. art. I, § 3.

¶15 Despite its broad language, this Court followed the lead of the Oklahoma Supreme Court in holding that Section 3 denies the State of Oklahoma criminal jurisdiction, only when the federal statutes grant jurisdiction to federal courts. The Court stated:

In Currey v. Corporation Commission, 617 P.2d 177 (Okl.1979), the Oklahoma Supreme Court indicated that section 3 was meant to disclaim jurisdiction over Indian lands only to the extent that the federal government claimed jurisdiction. Thus, where federal law does not purport to confer jurisdiction on the United States courts, the Oklahoma Constitution does not deprive Oklahoma courts from obtaining jurisdiction over the matter. (emphasis added)

Goforth, 1982 OK CR 48, ¶ 8, 644 P.2d at 116. Of course, this is not a Section 3 case, but Goforth's approach is instructive. When adjudicating a claim under the MCA where federal authority to prosecute has elapsed, we should avoid any construction or application of the MCA which creates a gap in jurisdiction, leaves an offender not subject to adequate prosecution, and does not advance the interests of tribal sovereignty. There is no reason to interpret this federal statute as creating such a void when we do not interpret arguably broader language in our own Constitution in such a manner. Accordingly, I would hold that where the record shows that federal jurisdiction is absent due to the expiration of the statute of limitations, the State of Oklahoma's jurisdiction is not preempted by the MCA.

¶16 For these reasons, I respectfully dissent.

FOOTNOTES

[1] If the federal court were to determine that the statute of limitations was equitably tolled during the pendency of the state prosecution, then of course my analysis herein would not apply. That issue does not appear to have been raised or briefed by the parties below. See Benge v. United States, 17 F.3d 1286, 1288 (10th Cir. 1994).

[2] In its supplemental brief, the State urges this Court instead to apply the doctrine of laches to preclude Roth from raising his McGirt claim this late in his proceedings. While I take no issue with this portion of the State's legal analysis, I find it unnecessary because, as stated above, I do not think state jurisdiction was automatically preempted six and a half years ago, without the MCA being properly invoked and proved during the time proper relief could be granted under the Act. In the final analysis, the State's laches argument and my position stated herein are probably kindred siblings, legally speaking.

 

 

LUMPKIN, JUDGE: CONCURRING IN RESULTS:

¶1 Bound by my oath and the Federal-State relationships dictated by the U.S. Constitution, I must at a minimum concur in the results of this opinion. While our nation's judicial structure requires me to apply the majority opinion in the 5-4 decision of the U.S. Supreme Court in McGirt v. Oklahoma, __ U.S. __, 140 S. Ct. 2452 (2020), I do so reluctantly. Upon the first reading of the majority opinion in McGirt, I initially formed the belief that it was a result in search of an opinion to support it. Then upon reading the dissents by Chief Justice Roberts and Justice Thomas, I was forced to conclude the Majority had totally failed to follow the Court's own precedents, but had cherry picked statutes and treaties, without giving historical context to them. The Majority then proceeded to do what an average citizen who had been fully informed of the law and facts as set out in the dissents would view as an exercise of raw judicial power to reach a decision which contravened not only the history leading to the disestablishment of the Indian reservations in Oklahoma, but also willfully disregarded and failed to apply the Court's own precedents to the issue at hand.

¶2 My quandary is one of ethics and morality. One of the first things I was taught when I began my service in the Marine Corps was that I had a duty to follow lawful orders, and that same duty required me to resist unlawful orders. Chief Justice Roberts's scholarly and judicially penned dissent, actually following the Court's precedents and required analysis, vividly reveals the failure of the majority opinion to follow the rule of law and apply over a century of precedent and history, and to accept the fact that no Indian reservations remain in the State of Oklahoma.[1] The result seems to be some form of "social justice" created out of whole cloth rather than a continuation of the solid precedents the Court has established over the last 100 years or more.

¶3 The question I see presented is should I blindly follow and apply the majority opinion or do I join with Chief Justice Roberts and the dissenters in McGirt and recognize "the emperor has no clothes" as to the adherence to following the rule of law in the application of the McGirt decision?

¶4 My oath and adherence to the Federal-State relationship under the U.S. Constitution mandate that I fulfill my duties and apply the edict of the majority opinion in McGirt. However, I am not required to do so blindly and without noting the flaws of the opinion as set out in the dissents. Chief Justice Roberts and Justice Thomas eloquently show the Majority's mischaracterization of Congress's actions and history with the Indian reservations. Their dissents further demonstrate that at the time of Oklahoma Statehood in 1907, all parties accepted the fact that Indian reservations in the state had been disestablished and no longer existed. I take this position to adhere to my oath as a judge and lawyer without any disrespect to our Federal-State structure. I simply believe that when reasonable minds differ they must both be reviewing the totality of the law and facts.

FOOTNOTES

[1] Senator Elmer Thomas, D-Oklahoma, was a member of the Senate Committee on Indian Affairs. After hearing the Commissioner's speech regarding the Indian Reorganization Act (IRA) in 1934, Senator Thomas opined as follows:

I can hardly see where it (the IRA) could operate in a State like mine where the Indians are all scattered out among the whites and they have no reservation, and they could not get them into a community without you would go and buy land and put them on it. Then they would be surrounded very likely with thickly populated white sections with whom they would trade and associate. I just cannot get through my mind how this bill can possibly be made to operate in a State of thickly-settled population. (emphasis added).

John Collier, Commissioner of Indian Affairs, Memorandum of Explanation (regarding S. 2755), p. 145, hearing before the United States Senate Committee on Indian Affairs, February 27, 1934. Senator Morris Sheppard, D-Texas, also on the Senate Committee on Indian Affairs, stated in response to the Commissioner's speech that in Oklahoma, he did not think "we could look forward to building up huge reservations such as we have granted to the Indians in the past." Id. at 157. In 1940, in the Foreword to Felix S. Cohen, Handbook of Federal Indian Law (1942), Secretary of the Interior Harold Ickes wrote in support of the IRA, "[t]he continued application of the allotment laws, under which Indian wards have lost more than two-thirds of their reservation lands, while the costs of Federal administration of these lands have steadily mounted, must be terminated." (emphasis added).

 

 

LEWIS, JUDGE, SPECIALLY CONCURRING:

¶1 I specially concur in the reversal of this conviction with instructions to dismiss. The Indian Country Crimes Act, 18 U.S.C. § 1152, extends the general criminal laws of federal maritime and enclave jurisdiction to Indian Country, excepting offenses committed by one Indian against another. Crimes of murder and manslaughter are among those general criminal laws. 18 U.S.C. 1111-12. "Within Indian country, state jurisdiction is limited to crimes by non-Indians against non-Indians . . . ." Solem v. Bartlett, 465 U.S. 463, 465 n.2 (1984) (emphasis added); see also, Donnelly v. United States, 228 U.S. 243, 269-72 (1913) (recognizing sole and exclusive federal jurisdiction of murder of Indian committed by non-Indian in Indian Country after California statehood). The State of Oklahoma has no concurrent jurisdiction to prosecute this homicide against an Indian in Indian Country. I therefore join this portion of the Court's opinion.

 





 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 2021 OK CR 37, STATE v. LAWHORN
Discussed at Length
 2021 OK CR 38, MCCLAIN v. STATE
Discussed


 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 2021 OK CR 3, 484 P.3d 286, WITHDRAWN
Cited
 2021 OK CR 4, HOGNER v. STATE
Cited
 2021 OK CR 11, 489 P.3d 528, WITHDRAWN
Cited
 2021 OK CR 17, 495 P.3d 653, PARKER v. STATE
Cited
 2021 OK CR 21, 497 P.3d 686, STATE ex rel. MATLOFF v. WALLACE
Discussed
 2021 OK CR 23, 495 P.3d 669, BOSSE v. STATE
Cited
 2021 OK CR 25, 495 P.3d 669, RYDER v. STATE
Cited
 1982 OK CR 48, 644 P.2d 114, GOFORTH v. STATE
Discussed at Length
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1979 OK 89, 617 P.2d 177, CURREY v. CORPORATION COM'N OF OKLAHOMA
Cited
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 13.1, Required Service of Minimum Percentage of Sentence - Offenses Specified
Cited
 21 O.S. 711, First Degree Manslaughter
Cited
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 846, Procedure Where Another County Has Exclusive Jurisdiction
Cited
Title 47. Motor Vehicles
 Cite
Name
Level

 47 O.S. 10-102.1, Accidents Resulting in Death - Failure to Stop
Discussed


 
 








 
 
 
 

 
 




 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA